**Richard Franklin MILLER et al., Plaintiffs,**

v.

**Dale CARSON, Individually and in his capacity as Sheriff of Duval County, Florida, and the Consolidated City of Jacksonville, Florida, et al., Defendants.**

**No. 74-382-Civ-J-S.**

United States District Court, M. D. Florida, Jacksonville Division.

Jan. 31, 1975.

Order to Show Cause March 6, 1975.

Order Changing Parties March 17, 1975.

Opinion Awarding Attorneys' Fees June 12, 1975.

Order and Opinion and Permanent Injunction July 17, 1975.

William J. Sheppard, Jacksonville, Fla., for plaintiffs.

William L. Coalson, Jacksonville, Fla., for "City Defendants."

T. Edward Austin, Jr., Jacksonville, Fla., amicus curiae.

Laurence C. Pritchard, Jacksonville, Fla., for T. Edward Austin, amicus curiae.

Gerald Schneider, Jacksonville, Fla., for Jacksonville Hospital Authority.

Raymond W. Gearey, Jr., Atty., Fla. Div. of Corrections, Tallahassee, Fla., for Fla. Div. of Corrections and the other State defendants.

Donna Stinson, Asst. Atty. Gen., Dept. of Legal Affairs, Civil Div., Tallahassee, Fla., for Louie L. Wainwright.

Julius F. Parker, Jr., Tallahassee, Fla., for Fla. Sheriff's Ass'n.

Charles B. Lembcke, Asst. U. S. Atty., Jacksonville, Fla., for Mitchell A. Newberger, U. S. Marshal.

United States Magistrate, Ombudsman, Jacksonville, Fla.

## ORDER AND DECLARATORY JUDGMENT

CHARLES R. SCOTT, District Judge.

This is a class action with the Court having heretofore ruled that the action is properly maintainable by plaintiffs as a class action consisting of all persons, male and female, who are presently or in the future will be incarcerated in the Duval County Jail, Jacksonville, Florida. The purpose of this action is to improve the conditions which exist at the Duval County Jail.

The Court finds that it has jurisdiction over the parties hereto and the subject matter hereof and the plaintiffs are entitled to a declaratory judgment against the defendants Dale Carson, individually and in his capacity as Sheriff of Duval County, Florida, and the Consolidated City of Jacksonville, Florida; Hans G. Tanzler, individually and in his capacity as Mayor of the Consolidated City of Jacksonville, Florida; Don Brewer, Jr., Joe Carlucci, Julian Fant, Jr., Joe Forshee, Jake M. Godbold, David Harrell, J. Earl Huntley, Frank Hampton, Earl Johnson, Preben Johansen, Mickey King, John G. Lanahan, Sallye Mathis, Lynwood Roberts, Johnny Sanders, I. M. Sulzbacher, Larry Teague, Charlie Webb, Walter Williams, Jr., individually and in their respective capacities as Councilmen and Councilwoman of the Consolidated City of Jacksonville City Council; Robert E. Page, individually and in his capacity as Deputy Director of Prisons and Jails, Consolidated City of Jacksonville, Florida; and R. W. Grant, individually and in his capacity as Chief of Jails, Consolidated City of Jacksonville, Florida, and against the successors, agents, servants and employees of each of said defendants with respect to the following:

1. The conditions found to exist in the Duval County Jail, being considerably worse than those to which many sentenced prisoners are subjected in Florida, even though the majority of plaintiffs and the subclass of pretrial detainees they represent have not been convicted and are not subject to punishment for any crime, are in violation of the rights of plaintiffs and the subclass of pretrial detainees they represent under the equal protection clause of the Fourteenth Amendment to the Constitution of the United States.

2. The conditions found to exist in the Duval County Jail are severely punitive in nature and effectively punish

plaintiffs and the subclasses they represent, the large majority of whom are detained prior to trial before they have been convicted of any crimes, or given any sentence, thus depriving them of life and liberty without due process of law, and contravening the presumption that they are innocent until proven guilty, all in violation of their rights under the Fifth and Fourteenth Amendments to the Constitution of the United States.

■ 3. The conditions found to exist in the Duval County Jail are so extreme as to constitute the infliction of punishment which is both cruel and unusual in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

■ 4. The conditions found to exist in the Duval County Jail relating to lack of access to a library and to law books, the restrictions on visiting privileges, the limitations on telephonic communications deprive plaintiffs and the subclasses they represent to effective assistance of counsel, the ability to assist in the preparation of a defense and to secure witnesses in their behalf, all in violation of their rights under the Sixth and Fourteenth Amendments to the Constitution of the United States.

■ 5. The restrictions on religious freedom found to exist in the Duval County Jail deprive plaintiffs and the subclasses they represent of their rights under the First and Fourteenth Amendments to the Constitution of the United States.

■ 6. The arbitrary, capricious and unlawful summary discipline administered by the officials to the inmates at the Duval County Jail deprives plaintiffs and the subclasses they represent of due process of law in violation of their rights under the Fifth and Fourteenth Amendments to the Constitution of the United States.

■ 7. The arbitrary and capricious limitations placed upon access to families and friends, and upon delivery of packages and the failure to provide even a daily newspaper to the inmates in the Duval County Jail deprive the plaintiffs and the subclass which they represent of their rights under the First and Fourteenth Amendments to the Constitution of the United States.

Ordered and adjudged:

That this Court retains jurisdiction for the purpose of implementation of this Order and Declaratory Judgment.

ORDER TO SHOW CAUSE

On January 31, 1975, this Court entered a declaratory judgment, with supporting findings of fact and conclusions of law, which declared that the conditions in the Duval County Jail were "so extreme as to constitute the infliction of punishment which is both cruel and unusual in violation of the Eighth and Fourteenth Amendments to the United States Constitution"; that those conditions were so severely punitive as to "effectively punish plaintiffs and the subclasses they represent," the large majority of whom were pre-trial detainees, "thus depriving them of life and liberty without due process of law, and contravening the presumption that they are innocent until proven guilty"; that said conditions operated to deprive the plaintiffs of their right to effective assistance of counsel and their ability to assist in the preparation of a defense and to secure witnesses in their behalf, so as to violate their Sixth and Fourteenth Amendment rights.

In addition, this Court declared that the restrictions on religious freedom found to exist in the Duval County Jail violated the plaintiffs' rights under the First and Fourteenth Amendments; that the "arbitrary, capricious and unlawful summary discipline administered to inmates of the Duval County Jail deprived plaintiffs of their procedural due process rights under the Fifth and Fourteenth Amendments"; and that the restrictions imposed by the defendants upon access to families and friends, reading materials and the delivery of

mail violated the First and Fourteenth Amendments. Finally, this Court declared that the conditions in the Duval County Jail, to the extent that they were worse than those to which most sentenced prisoners are subjected in Florida, violated the Equal Protection Clause of the Fourteenth Amendment as to those plaintiffs who were pre-trial detainees.

On this basis, this Court, contemporaneously therewith, issued a preliminary injunction in order to partially remedy the constitutionally offensive practices of the defendants. On February 6, 1975, the city defendants filed a motion to modify and/or clarify certain portions of the preliminary injunction. A hearing was held thereon and this Court, on February 25, 1975, entered its order and memorandum opinion which did, in fact, modify and clarify certain provisions in the preliminary injunction.

On February 13, 1975, this Court appointed the United States Magistrate for the Jacksonville Division of the Middle District of Florida as Ombudsman "to relieve the Court of the time-consuming attention required on a day-to-day basis in a case of this nature." That order stated that the Ombudsman's duty was "to aid this Court in developing and resolving issues that may arise in the day-to-day operation of the Duval County Jail with regard to the preliminary injunction issued by this Court on January 31, 1975, and any subsequent injunctions or decrees entered herein."

On this basis, in response to numerous complaints concerning alleged violations of this Court's preliminary injunction, the Ombudsman inspected the jail, talked to inmates and correctional staff, held conferences with counsel and conducted hearings at which evidence was adduced, both testimonial and documentary in nature. On March 4, 1975, the Ombudsman filed a report covering the period from the date of his appointment through March 1, 1975. The substance of the Ombudsman's report is that this Court's preliminary injunction of January 31, 1975, and the modification order of February 25, 1975, have been violated in numerous respects, with specific details thereof. In each instance, the defendants either admitted the violations or adduced no evidence to the contrary. The Ombudsman's conclusions can best be summarized in the concluding sentence in his report:

> The Ombudsman finds that this Court's orders of January 31, 1975, and February 25, 1975, have been violated in the respects outlined above. Although there have been changes in administration, numerous conferences and memos, from the viewpoint of the plaintiffs, except for the reduced population, conditions at the Duval County Jail are no different today than on January 31, 1975, the date of the Court's order.

A review of the Ombudsman's report yields the same conclusion, that is, that the plaintiffs' constitutional rights are still being violated to the same degree that they were prior to January 31, 1975. Although the violations are varied and widespread, the Ombudsman focused on two conditions that were far more serious than the others:

> These two conditions—lack of personnel and plumbing—standing alone, render the Duval County Jail *almost totally unsuitable as a facility for the housing of pretrial detainees (presumed to be innocent) and sentenced misdemeanants.* (emphasis added)

These two highlighted conditions, coupled with the other conditions shown to exist in the Duval County Jail, present a picture not totally unlike the Lucas County Jail in Toledo, Ohio, the conditions of which were declared to be unconstitutional in the case of *Jones v. Wittenberg,* 323 F.Supp. 93 (N.D.Ohio 1971):

> . . . In any event, when the total picture of confinement in the Lucas County Jail is examined, what appears is confinement in cramped and over-

crowded quarters, lightless, airless, damp and filthy with leaking water and human wastes, slow starvation, deprivation of most human contacts, except with others in the same sub-human state, no exercise or recreation, little if any medical attention, no attempt at rehabilitation, and for those who in despair or frustration lash out at their surroundings, confinement, stripped of clothing and every last vestige of humanity, in a sort of oubliette.

323 F.Supp. at 99. Thereafter, the Court entered a farreaching injunction, *Jones v. Wittenberg*, 330 F.Supp. 707 (N.D.Ohio 1971), which was affirmed *sub nom. Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972).

In light of the Ombudsman's findings, this Court cannot ignore the serious constitutional deprivations that are continuing to occur despite this Court's preliminary injunction entered over a month ago. These deprivations are subjecting the plaintiffs, the majority of whom are pre-trial detainees, to cruel and unusual punishment, when at the same time the law has afforded them a presumption of innocence. As pointed out in *Hamilton v. Love*, 328 F.Supp. 1182 (E.D.Ark. 1971):

> The inmates of the Pulaski County jail should not be referred to as "convicts" or even "prisoners", considering the usual connotations of such terms. Furthermore, it is not really appropriate to judge the constitutionality of the conditions of their incarcerations by referring to the "cruel and unusual punishment" provisions of the Eighth Amendment. Having been convicted of no crime, the detainees should not have to suffer *any* "punishment", as such, whether "cruel and unusual" or not. (emphasis in original)

328 F.Supp. at 1191.

■ Thus, this Court is faced with the situation that its remedial orders are not being complied with and the grim constitutional deprivations are continuing apace. The appropriate solution to this problem lies not in civil contempt citations for those responsible for implementing this Court's injunction since there is no direct evidence before this Court, at this time, of any recalcitrance or lack of diligence on their part so as to justify such a course of action. In addition, a contempt citation, even if justified, would, by virtue of its somewhat punitive nature, not necessarily eliminate or alleviate the most loathsome conditions in the Duval County Jail. Perhaps the elimination of the stench, the vermin, the human wastes, the intermittent lack of medical attention, sanitation, guard protection from inmate brutality, drinking water, commode facilities and outside human contacts, as well as the lack of light, fresh air and exercise, present insuperable difficulties which are directly attributable to lack of funds appropriated for such purposes. However, the Court cannot and will not allow these conditions to persist for either pre-trial detainees or sentenced prisoners. Therefore, this Court must seriously consider the strong possibility of closing, in whole or in part, the Duval County Jail as a facility for housing pre-trial detainees and sentenced prisoners. As further pointed out in *Hamilton v. Love, supra*:

> Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights. If the state cannot obtain the resources to detain persons awaiting trial in accordance with minimum constitutional standards, then the state simply will not be permitted to detain such persons. The final decision may, indeed, rest with the qualified voters of the governmental unit involved. This Court, of course, cannot require the voters to make available the resources needed to meet constitutional standards, *but it can and must require the release of persons held under conditions which violate*

*their constitutional rights, at least where the correction of such conditions is not brought about within a reasonable time.* (emphasis added) 328 F.Supp. at 1194. This approach has been upheld in the Fifth Circuit in the case of *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974), with regard to a state prison system, wherein the Court cited *Hamilton v. Love, supra,* with approval. The Court specifically held therein that the "[s]hortage of funds is not a justification for continuing to deny citizens their constitutional rights." 501 F.2d at 1320. *See also Finney v. Arkansas Board of Correction,* 505 F.2d 194 (8th Cir. 1974). This Court, likewise, must not shirk its constitutional responsibility.

Therefore, it is

Ordered and adjudged:

1. The Report of the Ombudsman, filed herein March 4, 1975, is hereby adopted and confirmed.

2. This Court finds the city defendants to be in material violation of this Court's preliminary injunction of January 31, 1975, and the modification order of February 25, 1975.

3. The city defendants, either personally or through counsel, are hereby required to show cause, if any they have, on Wednesday, March 26, 1975, at 9:30 A.M. in Court Room No. 2, Fifth Floor, United States Court House and Post Office Building, 311 West Monroe Street, Jacksonville, Florida, why the Duval County Jail should not be closed, in whole or in part, as a facility for the incarceration of pre-trial detainees and sentenced prisoners, for failure to maintain said facility in accordance with minimum constitutional standards, and for failure to comply with this Court's preliminary injunction of January 31, 1975, and the modification order of February 25, 1975.

## ORDER CHANGING PARTIES

This cause came before the Court with respect to the plaintiffs' motion for leave of Court to amend their amended complaint, filed herein March 3, 1975. The plaintiffs seek to add as party defendants the following persons:

(1) D. K. Brown, individually and as Undersheriff of Duval County and the Consolidated City of Jacksonville.

(2) Fred W. Murray, Jr., individually and as Director of the Duval County Jail.

(3) James R. McMillan, individually and as Acting Chief of the Duval County Jail.

(4) John R. Smith, individually and as Director of Police Services.

At the hearing on March 14, 1975, with regard to said motion, no objection was made as to the joinder of the proposed defendants Murray and McMillan in their *official* capacities since they would automatically be added as successors to defendants Page and Grant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. However, objection was made to any joinder of Murray and McMillan in their *individual* capacities because of the potential liability to which they might be subjected. However, the plaintiffs have orally stipulated in open court, and this Court adopts and confirms said stipulation, that said proposed defendants will not be accountable in damages for any events which transpired or for any actions which were taken or not taken prior to the date of their joinder. On the basis of that stipulation, this Court will allow joinder of the proposed defendants Murray and McMillan, both in their official and individual capacities, as party defendants, for the sole purpose of ensuring implementation of this Court's injunctions, orders and decrees.

As to the proposed defendants Brown and Smith, there has not been a sufficient showing of their direct involvement in the operations of the Duval County Jail so as to justify their joinder as party defendants *at this time*. However, this Court wishes to make it em-

phatically clear to the proposed defendants Brown and Smith, as "agents, servants and employees" of persons already made parties defendant in this cause, that they are as bound by the orders of this Court in this case as any of the parties defendant because of their substantial participation in the proceedings in this case and because of their close identification with parties before the Court. *Mims v. Duval County School Board*, 338 F.Supp. 1208 (M.D.Fla. 1971); *United States v. Hall*, 472 F.2d 261 (5th Cir. 1972). In addition, the preliminary injunction issued on January 31, 1975, at page three thereof, clearly enjoined "all successors, agents, servants and employees" (in which they are necessarily included) of each of the defendants from violating the constitutional and pendent statutory rights of the plaintiffs in specific, detailed ways. Consequently, they are subject to the same sanctions that would be applicable to parties defendant for interference with the implementation of any of this Court's orders, injunctions or decrees. On that basis, then, the Court finds it appropriate to serve copies of the most significant orders heretofore entered in this case upon these two individuals.

Therefore, the motion to amend will be denied as to the proposed defendants Brown and Smith without prejudice to the plaintiffs' right to renew said motion on the basis that said individuals have become directly involved in the implementation of the preliminary injunction of January 31, 1975, and any other orders, injunctions and decrees of this Court.

In addition, the plaintiffs have stipulated to the dismissal of the defendant Grant, who has been replaced as Chief of Jails for the Consolidated City of Jacksonville. However, at least for the present time, the defendant Page will remain a party defendant.

Therefore, it is

Ordered:

1. Plaintiffs' motion for leave of Court to amend their amended complaint, filed herein March 3, 1975, is hereby granted to the limited extent set forth below.

2. Plaintiffs' amended complaint is hereby amended to include as party defendants the following persons:

 (a) Fred W. Murray, Jr., individually and as Director of the Duval County Jail.

 (b) James R. McMillan, individually and as Chief of the Duval County Jail.

3. Defendants Murray and McMillan shall not be liable in damages for any events which transpired or for any actions which were taken or not taken prior to the date service of the amended complaint is obtained upon said defendants.

4. The United States Marshal for the Middle District of Florida, or his authorized representative, is hereby directed to serve copies of the declaratory judgment, the findings of fact and conclusions of law and the order and preliminary injunction of January 31, 1975, the modification order of February 25, 1975, the order of February 13, 1975, with regard to racial segregation, and the order to show cause and the posting order of March 6, 1975, upon the following persons:

 (a) Fred W. Murray, Jr., Director of the Duval County Jail
 Duval County Court House
 Jacksonville, Florida, 32202

 (b) James R. McMillan, Chief of the Duval County Jail
 Duval County Court House
 Jacksonville, Florida, 32202

 (c) D. K. Brown, Undersheriff of Duval County and the Consolidated City of Jacksonville
 Duval County Court House
 Jacksonville, Florida, 32202

 (d) John R. Smith, Director of Police Services
 Duval County Court House
 Jacksonville, Florida, 32202

5. The aforesaid motion is hereby denied as to the proposed joinder of D.

K. Brown and John R. Smith without prejudice to the plaintiffs' right to renew said motion on the basis that said individuals have become directly involved in the implementation of this Court's orders, injunctions and decrees in this case.

6. This case is hereby dismissed as to defendant R. W. Grant, individually and in his capacity as Chief of Jails, Consolidated City of Jacksonville, Florida.

## ORDER AWARDING ATTORNEYS' FEES

This cause came before the Court with respect to the plaintiffs' motion for interim attorneys' fees and costs, with supporting affidavits, filed herein May 8, 1975. By virtue thereof, the plaintiffs seek to recover attorneys' fees against all the city defendants in their *official* capacities and against the defendant Carson in both his official and his *individual* capacity.[1] A hearing was held on this motion on May 21, 1975, and this Court, having considered the briefs and arguments of counsel, and the entire record in this case, hereby concludes that the plaintiffs' motion will be granted.

## I. BACKGROUND

On June 11, 1974, a handwritten *pro se* "Petition for Injunction" was filed in this Court by Richard Franklin Miller, a federal detainee temporarily housed in the Duval County Jail awaiting transfer to a federal institution. On June 14, 1974, this Court entered an order allowing the plaintiffs to proceed *in forma pauperis* and directed service of the complaint by the United States Marshal on the then sole defendant Sheriff Dale Carson. On June 19, 1974, the Court appointed William J. Sheppard, Esquire, of Sheppard, Fletcher, Hand & Adams, 215 Washington Street, Jacksonville, Florida, to represent the *pro se* plaintiffs in this case. An amended complaint was filed on July 26, 1974, which was answered on August 13, 1974. On September 17, 1974, the Court entered an order pursuant to motion filed by the plaintiff allowing this cause to proceed as a class action. The parties engaged in extensive discovery, including depositions, numerous sets of interrogatories, requests for production of documents, and the inspection of the Duval County Jail by a medical expert on behalf of the plaintiffs, Kenneth Babcock, M.D., a medical expert on behalf of the defendants, Samuel D. Rowley, M.D., as well as a corrections expert on behalf of the plaintiffs, Robert Charles Sarver, Esquire. In addition, the Federal Law Enforcement Assistance Administration conducted a survey of the Duval County Jail (and also the Jacksonville Correctional Institution) on behalf of the defendants, with recommendations for change.

The plaintiffs filed a motion for partial summary judgment as to the city defendants.[2] Subsequent to the filing of said motion, the plaintiffs entered into a stipulation with the city defendants providing that the motion would be redesignated as a "motion for partial summary judgment and motion for injunctive relief" pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. Thereafter defendants moved for a continuance of the hearing on said motion for partial summary

---

1. The claim for attorneys' fees against the defendant Page in his *individual* capacity, as distinguished from his *official* capacity, was orally withdrawn by the plaintiffs at the hearing held regarding the motion on May 21, 1975. The withdrawal of this particular claim, however, was made without prejudice to the plaintiffs' right to renew said claim in the future.

2. The term "city defendants" is used as a handy reference tool to distinguish those defendants who are officials and employees of the Consolidated City of Jacksonville from the other defendants in this case.

judgment which was set for December 10, 1974. The Court, after hearing, ordered that the plaintiffs would be allowed to present any evidence in support of their motion for partial summary judgment on December 10, 1974, and that the defendants would be allowed to respond to said motion at a hearing, the date for which would be set thereafter by the Court. Plaintiffs presented evidence in support of their motion commencing December 10, 1974, and the defendants presented evidence in opposition thereto commencing January 13, 1975.

At the hearing, the plaintiffs submitted affidavits, depositions of members of the plaintiff class, some of the defendants and employees of the defendants, numerous photographs of the interior and exterior of the Duval County Jail, interrogatories and the defendants' answers thereto, reports of the experts heretofore mentioned, and voluminous documentary evidence obtained by requests for production of documents served on the defendants. Included in the documentary evidence were several hundred "incident reports", which are reports required by jail personnel to be prepared with respect to all incidents of an unusual nature occurring in the operation of the Duval County Jail. The city defendants submitted a limited amount of documentary evidence and some affidavits. In rebuttal, the plaintiffs submitted additional documentary evidence and, by stipulation, called Captain Forrest Lind of the Jacksonville Sheriff's Office for testimony.

On January 31, 1975, this Court entered a declaratory judgment, with supporting findings of fact and conclusions of law, which declared that the conditions in the Duval County Jail were "so extreme as to constitute the infliction of punishment which is both cruel and unusual in violation of the Eighth and Fourteenth Amendments to the United States Constitution"; that those condi-

tions were so severely punitive as to "effectively punish plaintiffs and the subclasses they represent," the large majority of whom were pre-trial detainees, "thus depriving them of life and liberty without due process of law, and contravening the presumption that they are innocent until proven guilty"; that said conditions operated to deprive the plaintiffs of their right to effective assistance of counsel and their ability to assist in the preparation of a defense and to secure witnesses in their behalf, so as to violate their Sixth and Fourteenth Amendment rights.

In addition, this Court declared that the restrictions on religious freedom found to exist in the Duval County Jail violated the plaintiffs' rights under the First and Fourteenth Amendments; that the "arbitrary, capricious and unlawful summary discipline administered to inmates of the Duval County Jail deprived the plaintiffs of their procedural due process rights under the Fifth and Fourteenth Amendments"; and that the restrictions imposed by the defendants upon access to families and friends, reading materials and the delivery of mail, violated the First and Fourteenth Amendments. Finally, the Court declared that the conditions of the Duval County Jail, to the extent that they were worse than those to which most *sentenced* prisoners are subjected in Florida, violated the Equal Protection Clause of the Fourteenth Amendment as to those plaintiffs who were pre-trial detainees. This declaratory judgment was never appealed.

On this basis, this Court, contemporaneously therewith, issued a preliminary injunction in order to partially remedy the constitutionally offensive practices of the defendants. On February 6, 1975, the city defendants filed a motion to modify and/or clarify certain portions of the preliminary injunction. A hearing was held thereon and this Court, on February 25, 1975, entered its order and memorandum opinion which did, in

fact, modify and clarify certain provisions in the preliminary injunction.

On February 13, 1975, this Court appointed the United States Magistrate for the Jacksonville Division of the Middle District of Florida as Ombudsman "to relieve the Court of the time-consuming attention required on a day-to-day basis in a case of this nature." That order stated that the Ombudsman's duty was "to aid this Court in developing and resolving issues that may arise in the day-to-day operation of the Duval County Jail with regard to the preliminary injunction issued by this Court on January 31, 1975, and any subsequent injunctions or decrees entered herein."

On this basis, in response to numerous complaints concerning alleged violations of this Court's preliminary injunction, the Ombudsman inspected the jail, talked to inmates and correctional staff, held conferences with counsel and conducted hearings at which evidence was adduced, both testimonial and documentary in nature. On March 4, 1975, the Ombudsman filed Ombudsman's Report No. 1 covering the period from the date of his appointment through March 1, 1975. The substance of the Ombudsman's report was that this Court's preliminary injunction of January 31, 1975, and the modification order of February 25, 1975, were being violated in numerous respects, with specific details thereof. In each instance, the defendants either admitted the violations or adduced no evidence to the contrary. The Ombudsman's conclusions can best be summarized in the concluding sentence in his report:

The Ombudsman finds that this Court's orders of January 31, 1975, and February 25, 1975, have been violated in the respects outlined above. Although there have been changes in administration, numerous conferences and memos, from the viewpoint of the plaintiffs, except for the reduced population, conditions at the Duval County Jail are no different today than on January 31, 1975, the date of the Court's order.

As a result of the Ombudsman's Report No. 1, this Court entered its order to show cause requiring the city defendants to show cause, if any they had, why the Duval County Jail should not be closed, in whole or in part, as a facility for the incarceration of pre-trial detainees and sentenced prisoners, for failure to maintain said facility in accordance with minimum constitutional standards, and for failure to comply with this Court's preliminary injunction of January 31, 1975, and the modification order of February 25, 1975. The hearing on said order to show cause was held on March 26, 1975. As of the date of this order, this Court has not decided on the fate of the order to show cause. The final hearing on the proposed forms of permanent injunction was held on June 6, 1975, so that this Court may shortly enter its permanent injunction.

■■ On the basis of the foregoing, it is clear that the plaintiffs have prevailed on the merits of this case and that plaintiffs' counsel has rendered valuable services to his clients, the vast majority of whom are indigent and who individually could not possibly afford to retain private counsel to prosecute a lawsuit of this nature. It is also clear that the services of plaintiffs' counsel were required to a much greater extent because of the city defendants' inability to comply with this Court's preliminary injunction of January 31, 1975, and the modification order of February 25, 1975.

## II. THE DEMISE OF THE PRIVATE ATTORNEY GENERAL THEORY

■■ On May 12, 1975, the Supreme Court of the United States in the case of *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S. Ct. 1612, 44 L.Ed.2d 141, held that pre-

vailing parties in federal litigation could not recover attorneys' fees from the losing parties based on the "private attorney general" exception to the "American Rule" (which is that attorneys' fees are not ordinarily recoverable by the prevailing litigant in federal litigation in the absence of statutory authorization or contract. Although the narrow issue in that case involved the recovery of attorneys' fees by an environmental interest group proceeding under the National Environmental Policy Act to protect statutory rights, the broad, sweeping language of the opinion indicates that a prevailing plaintiff may not recover attorneys' fees under the "private attorney general" theory even where *constitutional* rights are at stake. Although this Court is hesitant to apply the *Alyeska Pipeline Service Co.*, holding beyond the limited parameters of the factual situation in that case where, to do so would have the effect of possibly emasculating the constitutional protections embodied in Section 1983, it must do so where the language in the opinion is so clear and explicit that the holding is expanded to include *any* attempt to utilize the "private attorney general" theory to recover attorneys' fees, regardless of the nature of the legal rights involved. Therefore, this Court holds that the plaintiffs cannot recover attorneys' fees based on the "private attorney general" theory.[3]

## III. OTHER THEORIES OF RECOVERY NOT PRECLUDED BY *ALYESKA*

The plaintiffs, although conceding the application of the *Alyeska Pipeline Service Co.* case to the "private attorney general" theory, seek to recover attorneys' fees on two other bases. One of these is "bad faith" on the part of the defendants. The other is the "common deceit" exception to the "American Rule." The city defendants, however, contend that the *Alyeska* case applies not only to eliminate the "private attorney general" theory (which had previously been sustained by at least seven Courts of Appeal, including the Fifth Circuit) as a basis for the recovery of attorneys' fees, but also serves to eradicate any exception whatsoever to the "American Rule." This Court finds this reading of *Alyeska, supra,* to be unwarranted and holds that the "bad faith"

3. The city defendants contend that the Eleventh Amendment operates as an absolute bar to the recovery of attorneys' fees against officers of a municipality to the extent that any such recovery would be satisfied out of the treasury of the Consolidated City of Jacksonville. This argument does not deserve extended treatment since the law in this area seems so well settled. As this Court pointed out in the case of *Young v. Hutchins,* 383 F.Supp. 1167 (M.D.Fla.1974) (which involved the recovery of back pay against elected city officials) :

The Supreme Court held in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L. Ed.2d 662 (1974), that the Eleventh Amendment operates as a bar to a federal court's awarding of retroactive welfare benefits where the payment of funds from the state treasury is required. However, footnote 12 of that opinion specifically stated that "a county does not occupy the same position as a state for purposes of the Eleventh Amendment", 94 S.Ct. at 1358, 39 L.Ed.2d at 675, thus recognizing "the long established rule that while county action is generally state action for purposes of the Fourteenth Amendment, a county defendant is not necessarily a state defendant for purposes of the Eleventh Amendment."

Because of the unique governmental nature of the Consolidated City of Jacksonville which unites the functions of both city and county governmental units into one essentially county-wide municipality, the defendants, as elective city officials, are clearly outside the scope of any Eleventh Amendment bar under the authorities cited in *Edelman v. Jordan, supra. See Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973) ; *Lincoln County v. Luning,* 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890).

383 F.Supp. at 1180, n. 19. Therefore, this Court holds that the recovery of attorneys' fees against officials of the Consolidated City of Jacksonville is not barred by the Eleventh Amendment. *Incarcerated Men of Allen County Jail v. Fair,* 507 F.2d 281, 287 (6th Cir. 1974).

and "common benefit" exceptions to the "American Rule" are still viable, despite the holding in *Alyeska.*

At pages 257–258, at page 1621 of 95 S.Ct. in *Alyeska,* the court stated as follows:

> To be sure, the fee statutes have been construed to allow, in limited circumstances, a reasonable attorneys' fee to the prevailing party in excess of the small sums permitted by § 1923. In *Trustees v. Greenough,* 105 U.S. 527 [26 L.Ed. 1157] (1881), the 1853 Act was read as not interfering with the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit. That rule has been consistently followed. *Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116 [5 S.Ct. 387, 28 L.Ed. 915] (1885); *Harrison v. Perea,* 168 U.S. 311, 325–326 [18 S.Ct. 129, 134–135, 42 L.Ed. 478] (1897); *United States v. Equitable Trust Co.,* 283 U.S. 738 [51 S.Ct. 639, 75 L.Ed. 1379] (1931); *Sprague v. Ticonic National Bank,* 307 U.S. 161 [59 S.Ct. 777, 83 L.Ed. 1184] (1939); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375 [90 S.Ct. 616, 24 L.Ed.2d 593] (1970); *Hall v. Cole,* 412 U.S. 1 [93 S.Ct. 1943, 36 L.Ed.2d 702] (1973); cf. *Hobbs v. McLean,* 117 U.S. 567, 581–582 [6 S.Ct. 870, 876–877, 29 L.Ed. 940] (1886). See generally Dawson, Lawyers and Involuntary Clients: Attorneys Fees from Funds, 87 Harv.L.Rev. 1597 (1974). Also a court may assess attorneys' fees for the "willful disobedience of a court order . . . as part of the fine to be levied on the defendant. *Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 426–428 [43 S.Ct. 458, 465–466, 67 L.Ed. 719] (1923)." *Fleischmann v. Maier Brew-*

*ing Co., supra,* 386 U.S. [714], at 718 [87 S.Ct. 1404, at 1407, 18 L.Ed.2d 475]; or when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons. . . ." *F. D. Rich Co., supra,* 417 U.S. [116], at 129 [94 S.Ct. 2157, at 2165, 40 L.Ed.2d 703] (citing *Vaughan v. Atkinson,* 369 U.S. 527 [82 S.Ct. 997, 8 L.Ed.2d 88] (1962); cf. *Universal Oil Products Co. v. Root Refining Co.,* 328 U.S. 575, 580 [66 S.Ct. 1176, 1179, 90 L.Ed. 1447] (1946)). These exceptions are unquestionably assertions of inherent power in the courts to allow attorneys' fees in particular situations, unless forbidden by Congress, but none of these exceptions is involved here. . . .

One of the cases cited as authority for the "common benefit" exception is the case of *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), wherein the Court stated as follows:

> While the general American rule is that attorneys' fees are not ordinarily recoverable as costs, both the courts and Congress have developed exceptions to this rule for situations in which overriding considerations indicate the need for such a recovery. A primary judge-created exception has been to award expenses where a plaintiff has successfully maintained a suit, usually on behalf of a class, that benefits a group of others in the same manner as himself. See *Fleischmann Corp. v. Maier Brewing Co.,* 386 U.S., at 718–719 [87 S.Ct. at 1407, 18 L.Ed.2d at 478, 479]. To allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense. This suit presents such a situation. The dissemination of misleading proxy solicitations was a "deceit practiced on the stockholders as a group," *J. I. Case Co. v. Borak,* 377 U.S. [426], at 432,

[84 S.Ct. 1555, at 1560, 12 L.Ed.2d 423 at 427], and the expenses of petitioners' lawsuit have been incurred for the benefit of the corporation and the other shareholders.

396 U.S. at 391–392, 90 S.Ct. at 625, 24 L.Ed.2d at 606.

As authority for the "bad faith" exception, the court referred to *F. D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703. In that case, a Miller Act plaintiff was awarded an attorney's fee and the court in reversing this award stated, in pertinent part, as follows:

The "American Rule" has not served, however, as an absolute bar to the shifting of attorneys' fees even in the absence of statute or contract. The federal judiciary has recognized several exceptions to the general principle that each party should bear the costs of its own legal representation. *We have long recognized that attorneys' fees may be awarded to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, or where a successful litigant has conferred a substantial benefit on a class of persons and the court's shifting of fees operates to spread the cost proportionately among the members of the benefitted class.* The lower courts have also applied a rationale for fee shifting based on the premise that the expense of litigation may often be a formidable if not insurmountable obstacle to the private litigation necessary to enforce important public policies. This "private attorney general" rationale has not been squarely before

this Court and it is not so now; nor do we intend to imply any view either on the validity or scope of that doctrine. It is sufficient for our purposes here to observe that this case clearly does not fall within any of these exceptions. (emphasis added)

417 U.S. at 129, 94 S.Ct. at 2165, 40 L. Ed.2d at 713–714.

Reading these three opinions together leaves this Court with the firm impression that the Supreme Court has consistently recognized two exceptions to the so-called "American Rule" regarding attorneys' fees: (1) the "bad faith" exception, and (2) the "common benefit" doctrine and that, if it wished to overrule its prior decisions regarding these two well-established exceptions, it would have explicitly done so. The tenor of the language of the *F. D. Rich* opinion indicates the firmly entrenched nature of these latter two exceptions in contrast to the then unresolved nature of the "private attorney general" theory in the Supreme Court (notwithstanding the weight of authority in the lower federal courts regarding the "private attorney general" theory). In addition, there is nothing in the *Alyeska Pipeline* opinion to implicitly suggest any retreat from the judicially created "bad faith" and "common benefit" exceptions to the "American Rule", which have been recognized and applied by the Supreme Court itself.[4]

Therefore, this Court concludes, as a matter of law, that the "bad faith" and "common benefit" exceptions to the "American Rule" regarding attorneys' fees retain their viability despite the *Alyeska Pipeline* opinion.

---

4. In footnote 46 of the Supreme Court's opinion, there was an additional indication of the availability of the "bad faith" exception as a basis for recovery of attorneys' fees:
 This Court's summary affirmance of the decision in *Sims v. Amos,* 340 F.Supp. 691 (M.D.Ala.1972), aff'd, 409 U.S. 942 [93 S.Ct. 290, 34 L.Ed.2d 215] (1972), cannot be taken as an acceptance of a judicially created private attorney general rule. The District Court in *Sims* indicated that there was an alternative ground available —the bad faith of the defendants—upon which to base the award of fees. 340 F. Supp., at 694. See also *Edelman v. Jordan,* 415 U.S. 651, 670–671 [94 S.Ct. 1347, 1359–1360, 39 L.Ed.2d 662] (1974).

## IV. THE APPLICABILITY OF THE "COMMON BENEFIT" DOCTRINE

The plaintiffs contend that the "common benefit" doctrine, as enunciated in *Mills v. Electric Auto-Lite Co., supra,* is an appropriate theory upon which to base an award of attorneys' fees in the instant case. This Court agrees.

As already indicated, the *Alyeska Pipeline* case is authority for the proposition that "a party preserving or recovering a fund for the benefit of others in addition to himself, . . . [may] recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit." *Alyeska Pipeline Service Co. v. Wilderness Society, supra,* 421 U.S. at 257, 95 S.Ct. at 1621. Although the language in *Alyeska* was couched in terms of a situation where the prevailing party has recovered funds from which an award of attorneys' fees can be made, there is explicit authority for the proposition that where a substantial benefit is conferred upon members of an ascertainable class, recovery of such a fund is not an absolute prerequisite to the applicability of the "common benefit" doctrine.

In *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), certain minority shareholders brought an action against corporations for filing a misleading proxy statement. The Supreme Court held, *inter alia,* that the absence of express statutory authorization did not preclude an award of counsel fees. In the course of its opinion, the Court stated as follows:

> The fact that this suit has not yet produced, and may never produce, a monetary recovery from which fees would be paid does not preclude an award based on this rationale. Although the earliest cases recognizing a right to reimbursement involved litigation that had produced or preserved

a "common fund" for the benefit of a group, nothing in these cases indicates that the suit must actually bring money into the court as a prerequisite to the court's power to order reimbursement of expenses.

"[T]he foundation for the historic practice of granting reimbursement for the cost of litigation other than the conventional taxable costs is part of the original authority of the chancellor to do equity in a particular situation." *Sprague v. Ticonic Nat. Bank,* 307 U.S. 161, 166, 59 S.Ct. 777, 780, 83 L.Ed. 1184 [1187] (1939).

. . .

Other cases have departed further from the traditional metes and bounds of the doctrine, to permit reimbursement in cases where the litigation has conferred a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them. This development has been most pronounced, in shareholders' derivative actions, where the courts increasingly have recognized that the expenses incurred by one shareholder in the vindication of a corporate right of action can be spread among all shareholders through an award against the corporation, regardless of whether an actual money recovery has been obtained in the corporation's favor. . . . In these cases there was a "common fund" only in the sense that the court's jurisdiction over the corporation as nominal defendant made it possible to assess fees against all of the shareholders through an award against the corporation.

In many of these instances the benefit conferred is capable of expression in monetary terms, if only by estimating the increase in the market value of the shares attributable to

the successful litigation. However, an increasing number of lower courts have acknowledged that a corporation may receive a "substantial benefit" from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature. A leading case is *Bosch v. Meeker Cooperative Light & Power Assn.*, 257 Minn. 362, 101 N.W.2d 423 (1960), in which *a stockholder was reimbursed for his expenses in obtaining a judicial declaration that the election of certain of the corporation's directors was invalid.* The Supreme Court of Minnesota stated: "Where an action by a stockholder results in a substantial benefit to a corporation he should recover his costs and expenses.

. . . [A] substantial benefit must be something more than technical in its consequence and be one that accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to the stockholder's interest." Id., at 366–367, 101 N.W.2d, at 426–427. . . .[5] (emphasis added)

396 U.S. at 392–395, 90 S.Ct. at 625.

This Court, at pages 30–31 of its order, findings of fact and conclusions of law, entered on January 31, 1975, contemporaneously with its preliminary injunction, coincidentally observed:

As a 1969 "Report of Grand Jury Relating to the County Jail of Duval County, Florida,", observed, and with which this Court agrees, ". . . the operation and management of the jail should be in a business-like fashion. We consider the sheriff the President of a big corporation and the taxpayers as stockholders of this corporation."

The analogy between minority shareholders suing to vindicate their common law corporate rights and the plaintiff in this case, who are suing to vindicate their constitutional rights, is a viable one. The situation of the plaintiffs in this case is quite similar to that of the Minnesota stockholder mentioned in the *Mills* case who was reimbursed for his expenses in obtaining a judicial declaration of invalidity of certain actions taken by the management of the corporation of which he was a part owner. The plaintiffs in this case have sought, and have in fact obtained, a judicial declaration that the actions of the defendants amounted to violations of their federal constitutional and pendent state statutory rights. In addition, they have obtained a judicial ruling in their favor on the merits and a preliminary injunction on behalf of an ascertainable class of citizens against the management of the body corporate, *i. e.*, the Consolidated City of Jacksonville, of which they are part owners. On the basis of the strong language in *Mills, supra,* it is irrelevant that they have not recovered or may never recover a monetary fund to be distributed to members of the class. The fact that they have sought and obtained a ruling, which was never appealed, in their favor which vindicates their constitutional and statutory rights is sufficient under Mills to justify an award of attorneys' fees.

The fact that there may be certain stockholders of the body corporation, *i. e.*, citizens of Duval County, perhaps a majority, that oppose the plaintiffs' successful attempt to improve conditions at the Duval County Jail does not defeat the plaintiffs' right to a reasonable attorneys' fee incurred as a result of their seeking to vindicate their "corporate", *i. e.*, constitutional and statutory, rights. The Constitution is fun-

5. This is not to say that the plaintiffs will never recover a monetary fund in this case. The plaintiffs still have damage claims out-

standing, the merits of which have never been adjudicated.

damentally no different than a corporate charter. A citizen may sue to prevent acts which are unconstitutional just as a minority stockholder may sue to prevent acts which are *ultra vires*:

> Minority stockholders, in a proper case, may sue to enjoin or redress ultra vires acts or acts forbidden by statute or against public policy, which will result in a waste, misapplication or diversion of the corporate assets, or which may destroy the corporation or render it unable to carry out its objects, provided the stockholder is unable to obtain relief through the corporation or its proper officers, and providing there is no undue delay in suing or acts constituting an estoppel. *This is based on the theory that a trust is created by implication, in favor of stockholders, that the corporation will manage the business so as not to defeat the objects for which it was created and will use and apply its assets for the purpose of carrying out those objects and not divert them to other purposes.* (emphasis added)

13 Fletcher, Cyclopedia of the Law of Private Corporations, § 5823, at 134 (1970). In the case at bar, the city defendants, as directors of the corporation, have committed *ultra vires, i. e.,* unconstitutional, acts and have thus violated the implied trust created in favor of *all* the stockholders, not just the majority. One of the purposes of both the Constitution and a corporate charter is to protect the rights of the minority from an oppressive majority. The plaintiffs, by bringing this lawsuit, have vindicated *their own* rights as citizens of the United States, the State of Florida, Duval County and the Consolidated City of Jacksonville. In addition, they have vindicated the rights of *all* the citizens of these governmental entities by preserving the integrity of the corporate charter, *i. e.,* the Constitution of the United States, in conjunction with the laws of the State of Florida.

The plaintiffs, by seeking to improve, and having to a certain extent successfully improved, the conditions in the Duval County Jail to a minimal constitutional and pendent statutory level, have rendered a "common benefit", not only to themselves, but to all citizens of Duval County. Conditions in a jail which resulted in cruel and unusual punishment and a denial of equal protection and due process disserve the entire public by fostering recidivism and perpetuating antisocial behavior. As the plaintiffs correctly point out, citizens who bring actions to vindicate constitutional rights should enjoy at least the same status as corporate shareholders who bring actions to vindicate corporate property rights. To suggest otherwise would in fact denigrate constitutional rights to a lower status than private monetary rights and would make a mockery of the Constitution of the United States.

Therefore, this Court concludes, that the plaintiffs, by rendering a clearly demonstrable "common benefit" involving the vindication of federal constitutional rights to an ascertainable class of persons, which may include all citizens of Duval County, are entitled to recover an attorneys' fee from the city defendants in their official capacities.

## V. "BAD FAITH"

As pointed out in Section III of this opinion, the "bad faith" exception to the "American Rule" regarding attorneys' fees remains extant despite the recent Supreme Court opinion in *Alyeska, supra.* This Court, upon a close review of the findings of fact entered in this case, concludes that there is solid basis for finding of bad faith on the part of the defendant Carson.

On page 13 of the order, findings of fact and conclusions of law, entered on January 31, 1975, this Court observed:

> The Court finds from the evidence that the overcrowding at the Duval

County Jail has existed for several years and that the defendants Carson and Page knew or should have known of said overcrowding. Reports were introduced on behalf of plaintiffs from Grand Juries of the Fourth Judicial Circuit of Florida, in and for Duval County, Florida, indicating Grand Juries' awareness of the overcrowded conditions in the Jail in years past. Numerous "Reports of Inspections of County Jails and County Prisons" prepared by the prison inspectors under the supervision of Defendant Louie Wainwright, Director, Division of Corrections, State of Florida, indicate, and the Court finds, that the Jail as early as January 1973 was "already overcrowded."

. . . . . .

At page 30 of the findings of fact and conclusions of law, this Court observed:

The foregoing complex personnel crisis at the Duval County Jail compounded by the design of the structure and the overcrowded conditions results in a daily horror show of violence. Rapes, assaults and attempted suicides are a common occurrence in this institution. *Plaintiffs introduced evidence in the form of "Incident Reports" prepared by Jail personnel documenting in excess of 150 occasions of brutality, in January—November, 1974, the majority of which incidents resulted in the need for medical care to injured inmates. Plaintiffs introduced "Incident Reports" showing that even during the course of the hearings in this cause, incidents of violence were occurring in the Duval County Jail.* (emphasis added)

Continuing on pages 30–31 thereof, this Court further observed:

From the totality of the evidence it is impossible for this Court not to conclude that many of the other problems existing in the Duval County Jail are attributable to the personnel problem. The inability to provide adequate medical care, food services, sanitation practices, recreational and rehabilitative efforts cannot be changed without a solution to the staffing crisis. As a 1969 "Report of Grand Jury Relating to the County Jail of Duval County, Florida," observed, and with which this Court agrees, " . . . the operation and management of the Jail should be in a business-like fashion. We consider the Sheriff the President of a big corporation and the taxpayers as stockholders of this corporation." The same Grand Jury concluded that the Sheriff did not have knowledge of the conditions at the Jail at that time due to his failure to regularly visit the Jail. From evidence presented by plaintiffs it affirmatively appears from the Sheriff's own admission in deposition that *he had not been present in the Duval County Jail but two times in a sixteen-month period ending in August 1974. The absence of regular visits occurred despite Defendant Carson's representation to the aforesaid Grand Jury in response to their Report that he would inspect the Jail personally on a monthly or semi-monthly basis for the purpose of verifying "Inspection Reports" prepared by prison inspectors for the Division of Corrections, State of Florida.* Plaintiffs introduced such reports for a five-year period and as this Court has on several occasions found, present conditions were referred to and criticized by these reports.

Plaintiffs further introduced unequivocal evidence that despite a budgetary appeal procedure available to the Sheriffs in the State of Florida pursuant to Fla.Stat. § 30.49, Defendant Sheriff Carson has never utilized this appeal procedure. The procedure provides for appeals to a State agency in the event a Sheriff in Florida does not in his opinion obtain adequate funds to perform his office from the local legislative branch and which pro-

cedure specifically refers to inadequate budgets for operating county jails.

The evidence shows that for the last five fiscal years the following sums were provided from Defendant Carson's budget for the operation of the Duval County Jail. The percentages reflect the percentage each sum was of the total budget of the Jacksonville Sheriff's office.

| Fiscal Year | Total Budget | Percentage |
|-------------|--------------|------------|
| 1974–1975 | $1,938,677.00 | 8.9% |
| 1973–1974 | $1,556,970.00 | 9.1% |
| 1972–1973 | $1,529,034.00 | 9.8% |
| 1971–1972 | $1,333,763.00 | 9.2% |
| 1970–1971 | $1,057,286.00 | 8.7% |

(emphasis added)

The numerous constitutional deprivations detailed in the findings of fact and conclusions of law are totally repugnant to the standards set forth in the Guidelines for Jail Operations of the National Sheriffs' Association (1972), the Manual of Correctional Standards issued by the American Correctional Association and the Corrections Manual of the National Advisory Commission on Criminal Justice Standards and Goals (1973). As an example, the Guidelines for Jail Operations of the National Sheriffs' Association, at page 72, provides that:

Prisoners' rights include, but are not necessarily limited to, nutritious and well-balanced diets in adequate quantities, prompt and complete medical and dental care, provisions for an acceptable level of sanitation (proper bedding and clothing and laundry service), personal hygiene (toilet articles and an opportunity to bathe frequently), proper ventilation and fresh air, adequate heating in winter months, adequate light, and a generally healthful environment, proper housing (not less than 50 square feet of floor space in any confined sleeping area is a nationally accepted standard), reasonable opportunities for physical exercise and recreational activities, and protection against any physical or psychological abuse or unnecessary indignity.

The evidence in this case indicates a total lack of compliance with these nationally accepted standards, which are adopted by the National Sheriffs' Association itself.

On page 73 of the same manual, it states: "Any racial segregation in a jail is unconstitutional." On page 14 of the findings of fact and conclusions of law, this Court observed:

It is uncontroverted that housing assignments in the holding cells of the Duval County Jail are made solely on account of race, that is to say there are all black and all white holding cells.

Upstairs housing assignments according to the defendants are made on the basis of 70% white to 30% black. The evidence, however, shows that the racial makeup of the population in the Duval County Jail is approximately 50% white and 50% black with frequent change as to which race is in the majority. Such an attempt to classify by race in the upstairs housing areas in the Duval County Jail results in numerous all-black cells.

On this basis, this Court, at page 7, Section IV, paragraph 1 of its preliminary injunction of January 31, 1975, ordered as follows:

No racially discriminatory practices of any nature shall occur during the operation or administration of the Duval County Jail, including housing assignments by race.

Despite this clear mandate, the defendants refused to desist from discriminating on the basis of race as to housing assignments unless they were given a "clear order" to the contrary, thus requiring this Court to enter a further or-

der on February 12, 1975, which ordered as follows:

\* \* \* \* \* \*

2. The defendants shall forthwith cease and desist from using race as a factor in the classification of inmates in any manner or form whatsoever.

3. The defendants shall immediately abolish and refrain from utilizing any systems, plan, regulations, direction or policy toward maintaining ratios based on race in any particular housing unit in the Duval County Jail.

This case is strikingly similar to the situation which existed in *Gates v. Collier,* 371 F.Supp. 1368 (N.D.Miss.1973), *aff'd* 489 F.2d 298 (5th Cir. 1973), wherein the defendants staunchly denied the existence of unconstitutional practices and conditions at Parchman Prison in Mississippi and wherein the Court awarded attorneys' fees based on a finding of bad faith:

In the instant case, we have no difficulty in finding that defendants' actions were unreasonable and obdurately obstinate. From commencement of the suit on February 8, 1971, defendants staunchly denied the existence of unconstitutional practices and conditions at Parchman. Defendants continued to adhere to this position at several lengthy evidentiary hearings of an interlocutory nature. The position thus consistently maintained by defendants compelled plaintiffs' attorney to expend time and expenses which otherwise would have not been incurred. Consequently, in preparation of plaintiffs' case, plaintiffs' attorney engaged in extensive pre-trial discovery, made numerous trips to Parchman, interviewed hundreds of inmates, and submitted a plethora of motions and accompanying legal memoranda. We are convinced that only because of the overwhelming magnitude of evidence gathered by plaintiffs' attorney in cooperation with the Department of Justice in support of the allegations contained in the complaint did defendants in effect recognize the futility of a full evidentiary hearing and submit the case on á virtually agreed record.

371 F.Supp. at 1371.[6]

In addition, the city defendants cannot reasonably contend that there is not a well-established body of law with respect to the legal rights of pre-trial detainees. There is a veritable plethora of cases on the subject: *Inmates of Milwaukee County Jail v. Petersen,* 353 F.Supp. 1157 (E.D.Wis.1973); *Wilson v. Beame,* 380 F.Supp. 1232 (E.D.N.Y. 1974); *Rhem v. Malcolm,* 371 F.Supp. 594 (S.D.N.Y.1974), *affirmed and remanded,* 507 F.2d 333 (2d Cir. 1974) *United States ex rel. Manicone v. Corso,* 365 F.Supp. 576 (E.D.N.Y.1973); *Collins v. Schoonfield,* 344 F.Supp. 257 (D. Md.1972); *Brenneman v. Madigan,* 343 F.Supp. 128 (N.D.Cal.1972); *Seale v. Manson,* 326 F.Supp. 1375 (D.Conn. 1971); *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676 (D.Mass. 1973); *Jones v. Wittenberg,* 323 F. Supp. 93 and 330 F.Supp. 707 (N.D.Ohio 1971), *aff'd sub nom. Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972); *Conklin v. Hancock,* 334 F.Supp. 1119 (D.N.H. 1971); *Davis v. Lindsay,* 321 F.Supp. 1134 (S.D.N.Y.1970); *See also* Note, "Constitutional Limitations on the Conditions of Pretrial Detention," 79 Yale Law Journal 941 (1970).

The well-established principle of these cases that a pre-trial detainee retains all the rights of an ordinary citizen except those necessary to assure his appearance

---

**6.** It should be pointed out that the plaintiffs in this case did not have the assistance of the Civil Rights Division of the Department of Justice as did the plaintiffs in *Gates v. Collier.*

for trial had its origin several hundred years ago in the days of Blackstone:

> Upon the whole, if the offense be not bailable, or the party cannot find bail, he is to be committed to the county gaol . . . there to abide till delivered by due course of law . . . But this imprisonment, as had been said, is only for safe custody, not for punishment. Therefore, in this dubious interval between the commitment and the trial, a prisoner ought to be used with the utmost humanity, and neither be loaded with needless fetters or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only.

4 Blackstone Commentaries 300. *See Rhem v. Malcolm, supra,* 371 F.Supp. at 622. In addition, it has been generally the law since at least 1944 that any prisoner, whether he is sentenced or convicted, "retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." *Coffin v. Reichard,* 143 F.2d 443, 445 (6th Cir. 1944). The defendant Carson cannot seriously contend that the degrading, humiliating and blatantly unconstitutional conditions to which he and his subordinates subjected the class of plaintiffs in this case were consistent with the established legal principles and correctional standards that existed at least three or four years prior to the inception of this lawsuit in June 1974. The defendant Carson could not reasonably fail to be aware of what was transpiring in the Duval County Jail prior to and during the pendency of this lawsuit. The only conclusion that this Court can draw from the overwhelming mass of evidence in this case is that the defendant Carson must either have consciously ignored the conditions in the Duval County Jail or consciously refused to rectify them, or both. In either case, this Court must conclude that the defendant Carson's actions were "unreasonable and obdurately obstinate" which

is the test for bad faith justifying an award of attorneys' fees in the Fifth Circuit. *Jinks v. Mays,* 464 F.2d 1223 (5th Cir. 1972); *Horton v. Lawrence County Board of Education,* 449 F.2d 793 (5th Cir. 1971); *Lee v. Southern Home Sites Corp.,* 429 F.2d 290 (5th Cir. 1970); *Williams v. Kimbrough,* 415 F.2d 874 (5th Cir. 1969); *Gates v. Collier, supra,* 371 F.Supp. at 1371.

"Such award is within the discretion of the district court, to remain undisturbed upon appeal in the absence of clear abuse." *Gates v. Collier, supra,* 371 F.Supp. at 1371; *See also Jinks v. Mays, supra.* This Court chooses to exercise its discretion to award the plaintiffs a reasonable attorneys' fee because of the importance of the rights vindicated and also because of the fact that this Court specifically appointed William J. Sheppard, Esquire, to represent the plaintiffs because he was the only attorney of which this Court had knowledge who was willing to undertake the tremendous financial burden inherent in a case of this nature.

Therefore, this Court concludes that the defendant Carson is liable to the plaintiffs in this case in both his official and his individual capacities for a reasonable attorneys' fee.

## VI. THE AMOUNT

In determining the amount of the reasonable attorneys' fee to be awarded in this case, this Court hereby adopts the 12 guidelines set forth in the Fifth Circuit opinion in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), which was a Title VII civil rights case. The application of these guidelines to the instant case is set forth below:

### (1) *The time and labor required*

The undisputed number of hours personally spent by plaintiffs' counsel, Wil-

liam J. Sheppard, Esquire, in out-of-court preparation as set forth by his affidavit amounts to 817.50 hours through April 30, 1975. The Court notes that many of the hours spent involved investigation, clerical work and the compilation of facts and statistics which probably could have been just as effectively accomplished by non-lawyer personnel had they been available to plaintiffs' counsel. Therefore, the hourly fee will be reduced from the fifty dollars to which this Court holds that plaintiffs' counsel would ordinarily be entitled for out-of-court work to forty dollars to offset that portion of the out-of-court work which could probably have been assigned to non-lawyer personnel.

The undisputed number of hours for in-court time specified in the affidavit was 100.50 hours. This Court concludes that the hourly rate for William J. Sheppard's in-court time should be sixty dollars for the reasons set forth below.

The uncontroverted time of attorneys who were in partnership with or employed by William J. Sheppard amounted to 235.40 hours. For the reasons set forth below, this Court feels that thirty dollars per hour would be appropriate for these other attorneys.

### (2) *The novelty and difficulty of the questions*

■ It cannot be said that the general constitutional principles regarding the rights of pre-trial detainees and sentenced prisoners have not been well established, as has already been pointed out by this Court. The law is clear as to the basic conditions of confinement for pre-trial detainees and sentenced prisoners. There have been, however, fairly recent developments in the law regarding such areas as mail censorship, procedural due process and inmate discipline and contact visitation. In addition, because it appears that this is the first jail case in the State of Florida, issues have arisen regarding the application of certain Florida statutes and administrative regulations which have never previously been authoritatively adjudicated. Furthermore, there is no question that this case has been an extremely complex one, from a factual point of view. Therefore, this Court concludes that the novelty and difficulty of some of the questions in this case should be taken into account.

### (3) *The skill requisite to perform the legal service properly*

This Court has closely observed plaintiffs' counsel's work product, his preparation and his general ability in this case and concludes that his skill is commensurate with that of some of the most able advocates that have ever practiced before this Court.

### (4) *The preclusion of other employment by the attorney due to acceptance of the case*

The number of hours expended by plaintiffs' counsel in this case tends to indicate that a large portion of his practice was devoted exclusively to this particular lawsuit to the preclusion of other employment.

### (5) *The customary fee*

The plaintiffs' counsel submitted two affidavits of able and experienced trial counsel in the Jacksonville area, Albert Datz, Esquire, and William Maness, Esquire, as to the prevailing hourly rate in the community for an attorney of the plaintiffs' counsel's skill and experience. Mr. Datz recommended a straight hourly fee of sixty dollars and Mr. Maness (formerly a state circuit judge) recommended a straight hourly fee of seventy-five dollars for William J. Sheppard's personal time and fifty dollars for that of his law partners and associate. This Court concludes, however, that, as to William J. Sheppard personally, an hour-

ly fee of sixty dollars for in-court time and forty dollars for out-of-court time would be apporpriate under all the circumstances. An hourly fee of thirty dollars would be appropriate as to the other attorneys' time.

### (6) *Whether the fee is fixed or contingent*

Since plaintiffs' counsel was appointed by this Court to represent the plaintiffs, there was no fee arrangement involved.

### (7) *Time limitations imposed by the client or the circumstances*

The time limitations that appeared to be imposed in this case were ones imposed by counsel upon himself out of his desire to secure relief as soon as was possible because of the extreme nature of the conditions involved at the Duval County Jail.

### (8) *The amount involved and the results obtained*

Since the damage claims have not been adjudicated, there is no monetary amount involved. There is no question, however, that there has been an adjudication on the merits in favor of the plaintiffs as to injunctive relief, which has benefited large numbers of individuals incarcerated in the Duval County Jail.

### (9) *The experience, reputation and ability of the attorneys*

William J. Sheppard is the senior partner of a five-man law firm in Jacksonville, Florida. He is 33 years old and has practiced law in Jacksonville for seven years. He spent two years in a large corporate law firm and five years in his present firm. He has specialized in criminal law and civil rights and is quite experienced in federal litigation. As this Court pointed out previously, plaintiffs' counsel has demonstrated skill

as a trial lawyer that is beyond that of trial lawyers with comparable trial experience. Because of the lack of experience of William J. Sheppard's co-counsel in the civil rights area, a lower fee for their work seems to be appropriate.

### (10) *The "undesirability" of the case*

There is no question that plaintiffs' counsel undertook an appointed task which no one else seemed to want. It also appears that the general reaction of the community to the position he has so skillfully advocated has not been pleasant. However, this Court is unable to ascertain the economic impact that his representation in this case has had on his law practice.

### (11) *The nature and length of the professional relationship with the client*

As a specialist in criminal law and civil rights, plaintiffs' counsel has had a great deal of exposure to representing clients accused of crimes.

### (12) *Awards in similar cases*

This Court is unable to make a comparison with awards in similar cases because of its unfamiliarity with them. However, the fact that this case was handled in the public interest, as opposed to the representation of a private client's interest, is a factor that tends to lower the customary fee in the community somewhat.

Taking all these factors together, including the fact that the plaintiffs are proceeding in forma pauperis, this Court concludes that a reasonable attorneys' fee would be sixty dollars per hour for William J. Sheppard's in-court time and forty dollars per hour for his out-of-court time, and a straight thirty dollar hourly rate for co-counsel's time, both in court and out of court. On this basis, the total amount of the interim attorneys' fee as of April 30, 1975, is

$45,792.00. Unless this Court is persuaded by evidence to the contrary, these hourly rates shall prevail throughout the duration of this lawsuit.

## VII. COSTS

This Court concludes that the following costs expended through March 31, 1975, may be properly taxed against the city defendants:

(1) *Service of Process—United States Marshal*

| | | |
|---|---|---|
| (a) Complaint | $ 25.92 | |
| (b) Subpoenas | $ 8.88 | ..... $ 34.80 |

(2) *Witness Fees*

| | | |
|---|---|---|
| (a) D. K. Brown | $ 20.00 | |
| (b) Dennis Blay | $ 20.50 | |
| (c) D. K. Brown | $ 20.00 | |
| (d) John Riley Smith | $ 20.00 | |
| (e) Ruth Johns | $ 20.00 | |
| (f) John F. Cleary | $ 20.00 | ..... $ 120.50 |

(3) *Court Reporter Fees for the Depositions of:*

| | | |
|---|---|---|
| (a) Dale Carson—8/21/74 | $167.50 | |
| (b) Inmates McCormick, Schiff, Sutton, Carnes, Nash and London—9/14/74 | $228.00 | |
| (c) Inmates Long and O'Connor—9/19/74 | $216.00 | |
| (d) Inmates in Holding Cells—9/28/74 | $299.75 | |
| (e) Chief Roland W. Grant, Jr.—10/4/74 | $279.25 | |
| (f) Inmate Timothy Charles Palmes—10/7/74 | $109.00 | |
| (g) Deputy Director Robert E. Page—10/9/74 | $454.25 | |
| (h) Inmates in Isolation—10/12/74 | $331.25 | |
| (i) Inmates in Cell 3–A—10/19/74 | $228.00 | |
| (j) Inmates Head and Cecere—10/30/74 | $ 72.25 | |
| (k) E. Charlton Prather, M. D., and Louie Wainwright—11/1/74 | $194.75 | |
| (l) Hal Stevens Costello—11/15/74 | $ 53.25 | |
| (m) D. K. Brown, Undersheriff—11/27/74 | $ 61.50 | |
| (n) Ruth Johns—12/13/74 | $147.50 | |
| (o) Ruth Johns—3/13/75 | $110.75 | |
| (p) Hans G. Tanzler, Jr., Mayor—3/20/75 | $ 82.75 | ..... $3,035.75 |

| | |
|---|---|
| (4) Photography—John J. Capo | $1,096.16 |
| (5) Printing Costs | $ 286.00 |
| (6) Publication and Reproduction of Documents | $ 50.71 |
| (7) Preparation of Floor Plan Display | $ 97.03 |
| (8) Xerox Copies (14,224 copies at 15¢ per copy) | $2,133.60 |

TOTAL ........................................ $6,854.55

This conclusion is based on the fact that the foregoing items appeared to be directly utilized in preparation for trial. *United States v. Kolesar,* 313 F.2d 835 (5th Cir. 1963), or are properly taxable under 28 U.S.C. § 1920.

Therefore, it is

Ordered and adjudged:

That the plaintiffs' motion for interim attorneys' fees and costs, filed herein May 8, 1975, is hereby granted to the limited extent set forth below; and, it is further

Ordered and adjudged:

That the plaintiffs recover of the defendants listed below (in their official capacities) costs in the amount of $6,854.55 and a reasonable attorneys' fee in the amount of $45,792.00, with interest thereon at the rate of 6%, for all of which let execution issue:

(a) Dale Carson, Sheriff of Duval County, Florida, and the Consolidated City of Jacksonville, Florida;

(b) Hans G. Tanzler, Jr., Mayor of the Consolidated City of Jacksonville, Florida;

(c) Don Brewer, Jr., Councilman of the Consolidated City of Jacksonville, City Council;

(d) Joe Carlucci, Councilman of the Consolidated City of Jacksonville, City Council;

(e) Julian Fant, Jr., Councilman of the Consolidated City of Jacksonville, City Council;

(f) Joe Forshee, Councilman of the Consolidated City of Jacksonville, City Council;

(g) Jake M. Godbold, Councilman of the Consolidated City of Jacksonville, City Council;

(h) David Harrell, Councilman of the Consolidated City of Jacksonville, City Council;

(i) J. Earl Huntley, Councilman of the Consolidated City of Jacksonville, City Council;

(j) Frank Hampton, Councilman of the Consolidated City of Jacksonville, City Council;

(k) Earl Johnson, Councilman of the Consolidated City of Jacksonville, City Council;

(*l*) Preben Johansen, Councilman of the Consolidated City of Jacksonville, City Council;

(m) Mickey King, Councilman of the Consolidated City of Jacksonville, City Council;

(n) John F. Lanahan, Councilman of the Consolidated City of Jacksonville, City Council;

(o) Sallye Mathis, Councilwoman of the Consolidated City of Jacksonville, City Council;

(p) Lynwood Roberts, Councilman of the Consolidated City of Jacksonville, City Council;

(q) Johnny Sanders, Councilman of the Consolidated City of Jacksonville, City Council;

(r) I. M. Sulzbacher, Councilman of the Consolidated City of Jacksonville, City Council;

(s) Larry Teague, Councilman of the Consolidated City of Jacksonville, City Council;

(t) Charlie Webb, Councilman of the Consolidated City of Jacksonville, City Council;

(u) Walter Williams, Jr., Councilman of the Consolidated City of Jacksonville, City Council; and

(v) Robert E. Page, Deputy Director of Prisons and Jails, Consolidated City of Jacksonville, Florida;

and, it is further

Ordered and adjudged:

That said costs and attorneys' fees shall be satisfied out of funds allocated to operate the Office of the Sheriff of Duval County, Florida; and, it is further

Ordered and adjudged:

That the plaintiffs recover of the defendant Dale Carson (in his *individual*

capacity) costs in the amount of $6,854.55 and a reasonable attorneys' fee in the amount of $45,792.00, with interest thereon at the rate of 6%, for all of which let execution issue; and, it is further

Ordered and adjudged:

That the plaintiffs are entitled to only one satisfaction thereof; and, it is further

Ordered and adjudged:

That the remittance for said costs and reasonable attorneys' fee be made directly to the law firm of Sheppard, Fletcher, Hand & Adams, 215 Washington Street, Jacksonville, Florida, 32202, *within twenty (20) days of the date of this order;* and, it is further

Ordered and adjudged:

That the plaintiffs' motion to strike, filed herein May 13, 1975, is hereby denied; and, it is further

Ordered and adjudged:

That the defendants' objection to a study of and recommendation for organizational restructuring of correctional facilities under the jurisdiction of the Sheriff in Jacksonville, Florida, by Ellis C. MacDougall and Stewart K. Reeves, filed herein May 8, 1975, is hereby overruled; and, it is further

Ordered and adjudged:

That Ellis C. MacDougall is hereby adopted as the Court's own expert witness.

## ORDER AND OPINION AND PERMANENT INJUNCTION

This is a class action with the class of plaintiffs consisting of all persons, male and female, who are presently or in the future will be incarcerated in the Duval County Jail, Jacksonville, Florida. Named as defendants are the Sheriff of Duval County, Florida, and the Consolidated City of Jacksonville; the Deputy Director of Prisons and Jails; the Director of the Duval County Jail and Chief of Jails; the Mayor; members of the City Council of the Consolidated City of Jacksonville; the Secretary of Health and Rehabilitative Services, State of Florida; the Director of the Division of Corrections, State of Florida; and the Director of the Division of Health, State of Florida.[1] T. Edward Austin, as State Attorney for the Fourth Judicial Circuit of the State of Florida, has been allowed to intervene as *amicus curiae.*

This action is brought pursuant to 42 U.S.C. §§ 1983, 1985 and 1986; the United States Constitution; and the laws of the State of Florida. This Court has jurisdiction under 28 U.S.C. §§ 1343(3), (4), providing for jurisdiction without regard to the amount in controversy in cases seeking redress from infringements of civil rights; under 28 U.S.C. § 1331, providing for jurisdiction in cases arising under the Constitution and laws of the United States; under 28 U.S.C. §§ 2201 and 2202, providing for declaratory and injunctive relief; and under the Court's pendent jurisdiction to hear claims arising under the laws of the State of Florida. The defendants named are properly before this Court.

By virtue of this lawsuit, the plaintiffs seek to improve the conditions at the Duval County Jail.

---

1. By order of this Court dated February 18, 1975, the plaintiffs were allowed to amend their complaint to add, as party defendants, Michael J. Wood, Executive Director of University Hospital, and Claude A. Mullis, Chairman, Hospital Authority of Jacksonville.

By order of this Court dated March 17, 1974, the plaintiffs were allowed to amend their complaint to add, as party defendants, Fred W. Murray, Jr., individually and as Director of the Duval County Jail, and James R. McMillan, individually and as Chief of the Duval County Jail, with the stipulation that the defendants Murray and McMillan would not be liable in damages for any events which transpired or for any actions which were taken or not taken prior to the date service was obtained upon said defendants.

## I. PROCEDURAL BACKGROUND

On June 11, 1974, a handwritten *pro se* "Petition for Injunction" was filed in this Court by Richard Franklin Miller, a federal trainee temporarily housed in the Duval County Jail awaiting transfer to a federal institution. On June 14, 1974, this Court entered an order allowing Richard Franklin Miller to proceed *in forma pauperis,* and directed service of the complaint by the United States Marshal on the then sole defendant Sheriff Dale Carson. On June 19, 1974, the Court appointed William J. Sheppard, Esquire, of Sheppard, Fletcher, Hand & Adams, 215 Washington Street, Jacksonville, Florida, to represent the *pro se* plaintiffs in this case. An amended complaint was filed on July 26, 1974, which was answered on August 13, 1974. On September 17, 1974, the Court entered an order pursuant to motion filed by the plaintiff allowing this cause to proceed as a class action with the class of plaintiffs divided into the following subclasses:

(a) *Subclass One* shall consist of all those inmates, male or female, who are presently or in the future will be incarcerated in the Duval County Jail awaiting trial in the County and Circuit Courts of Duval County, Florida.

(b) *Subclass Two* shall consist of all those inmates, male and female, who are presently or in the future will be incarcerated in the Duval County Jail following conviction in the County and Circuit Courts of Duval County, Florida.

(c) *Subclass Three* shall include all those federal prisoners who are presently or in the future will be incarcerated in the Duval County Jail awaiting trial in the federal court or awaiting transfer to a federal institution.

The parties engaged in extensive discovery, including depositions; numerous sets of interrogatories; requests for production of documents; and the inspection of the Duval County Jail by Kenneth B. Babcock, M.D., a medical expert on behalf of plaintiffs; Samuel D. Rowley, M.D., a medical expert on behalf of defendants; and Robert Charles Sarver, Esquire, a corrections expert on behalf of plaintiffs.

The plaintiffs filed a motion for partial summary judgment as to the defendants Carson, Tanzler, Councilmen and Councilwoman of the Consolidated City of Jacksonville City Council, Page and Grant. Subsequent to the filing of said motion, the plaintiffs entered into a stipulation with defendants providing that the aforesaid motion would be redesignated as a "motion for partial summary judgment and motion for injunctive relief" pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. Thereafter defendants moved for a continuance of the hearing on said motion for partial summary judgment which was set for December 10, 1974. The Court, after hearing, ordered that the plaintiffs would be allowed to present any evidence in support of their motion for partial summary judgment on December 10, 1974, and that the defendants would be allowed to respond to said motion at a hearing, the date for which would be set thereafter by the Court. The plaintiffs presented evidence in opposition thereto commencing January 13, 1975.

At the hearing the plaintiffs submitted affidavits; depositions of members of the plaintiff class and some of the defendants and employees of defendants; numerous photographs of the interior and exterior of the Duval County Jail; interrogatories and the defendants' answers thereto; reports of the experts heretofore mentioned; and voluminous documentary evidence obtained by requests for production of documents served on defendants. Included in the documentary evidence were several hundred "incident reports", reports required by jail personnel to be prepared with respect to all incidents of an unusual nature occurring in the operation of the Duval County Jail. Defendants submitted affidavits and some documentary evidence. In rebuttal, plaintiffs submitted docu-

mentary evidence and by stipulation called Captain Forrest Lind of the Jacksonville Sheriff's Office for testimony.

On January 31, 1975, this Court entered a declaratory judgment, with supporting findings of fact and conclusions of law, which declared that the conditions in the Duval County Jail were "so extreme as to constitute the infliction of punishment which is both cruel and unusual in violation of the Eighth and Fourteenth Amendments to the United States Constitution"; that those conditions were so severely punitive as to "effectively punish plaintiffs and the subclasses they represent," the vast majority of whom were pre-trial detainees, "thus depriving them of life and liberty without due process of law, and contravening the presumption that they are innocent until proven guilty"; that said conditions operated to deprive the plaintiffs of their right to effective assistance of counsel and their ability to assist in the preparation of a defense and to secure witnesses in their behalf, so as to violate their Sixth and Fourteenth Amendment rights.

In addition, this Court declared that the restrictions on religious freedom found to exist in the Duval County Jail violated the plaintiffs' rights under the First and Fourteenth Amendments; that the "arbitrary, capricious and unlawful summary discipline administered to inmates of the Duval County Jail deprived plaintiffs of their procedural due process rights under the Fifth and Fourteenth Amendments"; and that the restrictions imposed by the defendants upon access to families and friends, reading materials and the delivery of mail violated the First and Fourteenth Amendments. Finally, this Court declared that the conditions in the Duval County Jail, to the extent that they were worse than those to which most *sentenced* prisoners are subjected in Florida, violated the Equal Protection Clause of the Fourteenth Amendment as to those plaintiffs who were pre-trial detainees.

On this basis, this Court, contemporaneously therewith, issued a preliminary injunction in order to partially remedy the constitutionally offensive practices of the defendants. On February 6, 1975, the city defendants filed a motion to modify and/or clarify certain portions of the preliminary injunction. A hearing was held thereon and this Court, on February 25, 1975, entered its order and memorandum opinion which did, in fact, modify and clarify certain provisions in the preliminary injunction. *Miller v. Carson*, 392 F.Supp. 515 (M.D. Fla.1975).

On February 13, 1975, this Court appointed the United States Magistrate for the Jacksonville Division of the Middle District of Florida as Ombudsman "to relieve the Court of the time-consuming attention required on a day-to-day basis in a case of this nature." That order stated that the Ombudsman's duty was "to aid this Court in developing and resolving issues that may arise in the day-to-day operation of the Duval County Jail with regard to the preliminary injunction issued by this Court on January 31, 1975, and any subsequent injunctions or decrees entered herein."

On this basis, in response to numerous complaints concerning alleged violations of this Court's preliminary injunction, the Ombudsman inspected the jail, talked to inmates and correctional staff, held conferences with counsel and conducted hearings at which evidence was adduced, both testimonial and documentary in nature. On March 4, 1975, the Ombudsman filed Ombudsman's Report No. 1 covering the period from the date of his appointment through March 1, 1975. The substance of the Ombudsman's report was that this Court's preliminary injunction of January 31, 1975, and the modification order of February 25, 1975, were being violated in numerous respects, with specific details thereof. In each instance, the defendants either admitted the violations or adduced no evidence to the contrary. The Om-

budsman's conclusions can best be summarized in the concluding sentence in his report:

> The Ombudsman finds that this Court's orders of January 31, 1975, and February 25, 1975, have been violated in the respects outlined above. Although there have been changes in administration, numerous conferences and memos, from the viewpoint of the plaintiffs, except for the reduced population, conditions at the Duval County Jail are no different today than on January 31, 1975, the date of the Court's order.

As a result of the Ombudsman's Report No. 1, this Court entered its order to show cause requiring the city defendants to show cause, if any they had, why the Duval County Jail should not be closed, in whole or in part, as a facility for the incarceration of pre-trial detainees and sentenced prisoners, for failure to maintain said facility in accordance with minimum constitutional standards, and for failure to comply with this Court's preliminary injunction of January 31, 1975, and the modification order of February 25, 1975. The hearing on said order to show cause was held on March 26, 1975. The Court had the benefit of Ombudsman's Report No. 2 which indicated "[i]f additional people are hired and trained, there is every reason to believe the Duval County Jail will shortly be housing inmates (pre-trial detainees) in the manner required by the Constitution of the United States of America." This Court has not yet ruled upon the order to show cause.

The purpose of this order, opinion and permanent injunction is to further implement this Court's order, findings of fact and conclusions of law, as well as this Court's order and declaratory judgment of January 31, 1975, and to enjoin the defendants named herein from further operating and maintaining the Du-val County Jail in a manner infringing upon the constitutional and statutory rights of the plaintiffs and the class and subclasses they represent.

The Court has heretofore found that immediate and irreparable injury, loss and damage are resulting, and will continue to result, to plaintiffs and the class they represent. The injuries being suffered by the plaintiffs and the class and subclasses they represent are deprivations of their First, Fifth, Sixth, Eighth and Fourteenth Amendment rights.

## II. GENERAL PRINCIPLES

■■ Any discussion of the rights of inmates must begin with the well-established principle that an inmate, whether already convicted or merely detained pending trial, "retains all rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." *Jackson v. Godwin,* 400 F.2d 529, 532 (5th Cir. 1968), *quoting Coffin v. Reichard,* 143 F.2d 443, 445 (6th Cir. 1944). *See also Rhem v. Malcolm,* 371 F.Supp. 594, 622 (S.D. N.Y.1974), *affirmed and remanded* 507 F.2d 333 (2d Cir. 1974); *Sands v. Wainwright,* 357 F.Supp. 1062, 1094 (M.D.Fla.1973), *vacated on other grounds* 491 F.2d 417 (5th Cir. 1974); *Washington v. Lee,* 263 F.Supp. 327, 331 (M.D.Ala.1966), *aff'd per curiam* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). "The courts have a duty to protect prisoners ' . . . from unlawful and onerous treatment of a nature that, of itself, adds punitive measures to those legally meted out by the court.' " *Sands v. Wainwright, supra,* 357 F.Supp. at 1094, *quoting Jackson v. Godwin,* 400 F.2d 529, 532 (5th Cir. 1968).

Aside from the small percentage of the total inmate population who are awaiting transportation to permanent institutions[2] and those charged with

---

2. The evidence does not show the specific percentage of the inmates of the Duval County Jail who are pre-trial detainees. Although the percentage of pre-trial detainees has been estimated at about 85%, the evidence is uncontroverted that the vast majority of the inmates are in fact pre-trial detainees and that the Duval County Jail was

capital offenses, Fla.Const. Art. I, § 14, the only reason that the majority of the inmates of the Duval County Jail are incarcerated there is that they are awaiting trial and are too poor to afford bail. Therefore, "as individuals who have not been convicted of crime, they retain all rights retained by arrestees who have been released on bail, except for the curtailment of mobility deemed necessary to secure attendance at trial and the limitations necessary to protect the security of the institution in which they are detained." *Inmates of Milwaukee County Jail v. Petersen,* 353 F.Supp. 1157, 1160 (E.D.Wis.1973). "The state's right to interfere with the personal liberty of pretrial detainees is much more limited than its interest in dealing with convicted prisoners. The concept of the least restrictive form of incarceration consonant with the accused's being available for trial is inherent in jail prior to trial. It is the constitutional corollary of the constitutional right to bail." *Wilson v. Beame,* 380 F.Supp. 1232, 1236 (E.D.N.Y.1974). The cases which follow these well-established principles are legion.

*Hamilton v. Love,* 328 F.Supp. 1182, 1191 (E.D.Ark.1971); *Rhem v. Malcolm,* 371 F.Supp. 594, 623 (S.D.N.Y.1974), *affirmed and remanded* 507 F.2d 333 (2d Cir. 1974); *United States ex rel. Manicone v. Corso,* 365 F.Supp. 576, 577 (E.D.N.Y.1973); *Inmates of Milwaukee County Jail v. Petersen,* 353 F.Supp. 1157, 1160 (E.D.Wis.1973); *Collins v. Schoonfield,* 344 F.Supp. 257, 265 (D.Md. 1972); *Brenneman v. Madigan,* 343 F. Supp. 128, 138 (N.D.Cal.1972); *Seale v. Manson,* 326 F.Supp. 1375, 1379 (D. Conn.1971); *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676, 688 (D.Mass.1973); *Jones v. Wittenberg,* 323 F.Supp. 93 and 330 F.Supp. 707 (N.D.Ohio 1971), *aff'd sub nom Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972); *Taylor v. Sterrett,* 344 F.Supp. 411, 413 (N.D.Tex.1972), *aff'd* 499 F.2d 367 (5th Cir. 1974); *Conklin v. Hancock,* 334 F. Supp. 1119 (D.N.H.1971); *Davis v. Lindsay,* 321 F.Supp. 1134, 1139 (S.D. N.Y.1970); *See also* Note, "Constitutional Limitations on the Conditions of Pretrial Detention," 79 Yale Law Journal 941 (1970).[3]

exclusively designed and has always been primarily utilized as a maximum security facility for the detention of pre-trial detainees. The only reason that sentenced prisoners are forced to remain temporarily in the Duval County Jail is the fact that the Jacksonville Correctional Institution (which is used primarily for the housing of sentenced misdemeanants in Duval County) and the Florida state prison system are so critically overcrowded that state and local prison officials have administratively effected delays in the transportation of sentenced prisoners to permanent institutions.

Therefore, this Court considers it appropriate to consider all inmates of the Duval County Jail as if they were pre-trial detainees for the purpose of ascertaining and deciding exactly what constitutional and statutory standards should be applied to the conditions as they exist in the jail.

A partial reason for the lack of statistical precision is the fact that the current practice in the criminal system in Duval County seems to be the sentence to time served inmates who are awaiting trial for minor offenses in exchange for expedient guilty pleas. Thus, the classification of these particular inmates is susceptible to two differ-

ent interpretations. This constitutes an additional basis for treating all inmates in the Duval County Jail as if they were pre-trial detainees.

3. The Yale Law Journal commentator pointed out that punishment is not a valid purpose insofar as the treatment of pre-trial detainees is concerned:

The Supreme Court has considered the question whether a sanction constitutes punishment in cases involving deportation or deprivation of citizenship. The purpose behind the government's imposition of the sanction is the most determining factor. In cases like pretrial detention, where the purpose of any particular deprivation cannot be gleaned from legislative history, the court looks to the purpose which the sanction serves in practice. Unconstitutionality is established if the real aims prove to be the traditional punitive ones of retribution and deterrence. This interpretation is reinforced if the sanction is imposed on a group with an unusual objectionable ideology or other undesirable characteristics, toward whom the legislature is likely to have a punitive orientation. Detainees, impoverished and

All of the precedents for the foregoing principles are not necessarily of recent vintage:

> Upon the whole, if the offense be not bailable, or the party cannot find bail, he is to be committed to the county gaol . . . there to abide till delivered by due course of law. . . . But this imprisonment, as has been said, is only for safe custody, not for punishment: Therefore, in this dubious interval between the commitment and the trial, a prisoner ought to be used with the utmost humanity, and neither be loaded with needless fetters or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only.

4 Blackstone Commentaries 300. *See also Rhem v. Malcolm, supra,* 371 F. Supp. at 622.

Perhaps the best statement of the basic principles regarding the constitutional rights of pre-trial detainees emanates from an oft-cited law review article:

> It is a fundamental tenet of the American criminal system that a person is presumed innocent until proven guilty; he is not to be punished before he is tried and convicted of a crime. This applies as strongly to pretrial detainees as bailees and those who have not been accused of a crime. Accordingly, if the restrictive conditions under which detainees are held constitute punishment, subjecting detainees to those conditions violates the due process of law guaranteed by the Fifth and Fourteenth Amendments and the proscription against cruel and unusual punishment of the Eighth Amendment.

Note, "Constitutional Limitations on the Conditions of Pretrial Detention," 79 Yale Law Journal 941 (1970).

## III. RESTATEMENT OF THE FORMER FINDINGS OF FACT

The current status of the conditions in the Duval County Jail are reflected in the Ombudsman's Report No. 3 which is attached hereto as Appendix "A". This Court hereby restates, however, as its findings of fact, for purposes of permanent injunctive relief, those findings of fact which were entered in conjunction with the issuance of the preliminary injunction on January 31, 1975. It should be emphasized that because of substantial improvements in the conditions in the jail since about March 1, 1975 (primarily due to the excellent administration and the strenuous efforts of the defendants Murray and McMillan), approximately 90% of the former findings of fact entered with respect to the preliminary injunction are no longer applicable. However, for the sake of comparison, the recitation of those previous findings seems appropriate in order to justify the carryover of the provisions in the preliminary injunction to this permanent injunction:

### FINDINGS OF FACT

1. Defendant Hans G. Tanzler is the Mayor of the Consolidated City of Jacksonville, Florida, and as such is responsible for submitting an annual budget providing for adequate funds for the lawful operation of the Duval County Jail.

2. Defendants, Don Brewer, Jr., Joe Carlucci, Julian Fant, Jr., Joe Forshee, Jake M. Godbold, David Harrell, J. Earl Huntley, Frank Hampton, Earl Johnson, Preben Johansen, Mickey King, John F. Lanahan, Sallye Mathis, Lynwood Roberts, Johnny Sanders, I. M. Sulzbacher, Larry Teague, Charlie Webb, and Walter Williams, Jr. (or their official successors in office),[4] constitute the City

---

charged with crime, certainly fit this characterization.

*Note,* 79 Yale Law Journal 941, 952–953 (1970).

4. Rule 25(d) of the Federal Rules of Civil Procedure provides for the automatic substitution of successors to public officers. The following individuals are hereby automatical-

Council for the Consolidated City of Jacksonville, Florida, and as such are responsible for providing a jail and providing adequate funds, services, and supplies for the lawful operation of the Duval County Jail.

3. Defendant Dale Carson is the duly elected Sheriff of Duval County and the Consolidated City of Jacksonville, Florida, and as such is responsible for lawfully operating the Duval County Jail and providing lawful care and maintenance for the inmates thereof. Defendant Carson is also responsible for appointing and supervising the Deputy Director of Prisons and Jails as well as the Chief of Jails for the Consolidated City of Jacksonville, Florida.

4. Defendant Fred W. Murray is (and defendant Robert E. Page was formerly) the duly appointed Deputy Director of Prisons and Jails and as such is (and Robert E. Page was) responsible for lawfully operating the Duval County Jail and providing lawful care and maintenance of the inmates thereof.

5. Defendant James R. McMillan [5] is the duly appointed Chief of Jails and as such is responsible for lawfully operating the Duval County Jail and providing lawful care and maintenance of the inmates thereof.

6. The Duval County Jail is located at 400 East Bay Street, Jacksonville, Florida, and serves primarily as a facility for the pre-trial detention of persons who are awaiting trial on criminal charges in the Florida state and federal courts. The institution further serves as a detention facility for convicted state and federal prisoners awaiting assignment and transfer to other institutions. Of significance with respect to the purpose for which the institution is utilized is the fact that the jail was constructed in 1956, and has operated since that time as a maximum security facility. The Duval County Jail is a five-floor structure connected to the Duval County Court House located across Liberty Street by an overpass extending over Liberty Street. This arrangement results in individuals being housed in the jail from time of arrest until time of release or transfer to another institution without ever leaving the jail, the overpass or the Duval County Court House.

The first floor of the Duval County Jail consists of a receiving area, booking area, administrative offices, laundry, kitchen, officers' dining room, trustees' dining room, inmate property room, and holding cells. The mezzanine floor of the Duval County Jail consists of four (4) inmate-trustee cellblocks housing from 30 to 40 inmate-trustees utilized in the operation of the Duval County Jail primarily in the kitchen area. The mezzanine floor also has three 19-man medi-

ly substituted as parties defendant in their respective official capacities, pursuant to Rule 25:

(1) *City Councilmen and Councilwomen:*
Randy Amos, Nancy Crabb, McCarthy Crenshaw, John Goode, Rodney Hurst and Clarence Suggs
(2) *Secretary of Health and Rehabilitative Services, State of Florida:*
Emmett S. Roberts
The following individuals remain in the case as parties defendant in their individual capacities:
(1) *Former City Councilmen:*
Julian Fant, Jr., Frank Hampton, Mickey King, I. M. Sulzbacher, Larry Teague and Walter Williams, Jr.
(2) *Former Secretary of Health and Rehabilitative Services, State of Florida:*
O. J. Keller

(3) *Former Deputy Director of Prisons and Jails:*
Robert E. Page
Fred W. Murray, Jr. and James R. McMillan remain in the case as parties defendant, individually, and in their respective official capacities as Deputy Director of Prisons and Jails and Chief of Jails.

5. The Court allowed the claim against the defendant Roland W. Grant to be withdrawn by the plaintiffs on March 17, 1975, when the defendants Murray and McMillan were added as parties to this lawsuit.
It should also be pointed out that the title of the defendant Murray was changed to Deputy Director of Prisons and Jails and the title of the defendant McMillan was changed to Chief of Jails by the defendant Carson on June 6, 1975.

cal cells as well as five "isolation cells", chaplain's office, clinic, two female cells (now one cell) as well as additional administrative offices. The second, third and fourth floors of the Duval County Jail are substantially similar and consist of nine cellblocks designed to house eight, 10, 12, or 16 men per cellblock. Each floor has at least five solitary cells with the third and fourth floors having nine such cells. The second floor had an additional 10-man cellblock which did not have any showers available and in which juveniles present in the Duval County Jail were housed and which now serves as a law library. The stated capacity for which the Duval County Jail was constructed is 432.

The Court treats separately the facts raised by each issue of plaintiffs' amended complaint.

7.

## A—HOLDING CELLS

There are nine holding cells located in the Duval County Jail and these holding cells are used for various purposes. Two holding cells are used for pre-booking holding and one of these cells contained no benches. (Holding Cells 1–A and 1–B). Two holding cells are located near the property room and are used for various holding purposes. Neither of these two holding cells had any toilet or water facilities whatsoever. The remaining five holding cells (Holding Cells 1–D, 1–E, 1–F and 1–H) were originally constructed as drunk tanks but are now used for post-booking holding cells while awaiting transfer to space as it becomes available on the upper floors of the jail and for storage purposes. Holding Cell 1–D did not have water available and from the evidence it appears that this condition had existed for months. It is apparent that despite the lack of water facilities, Holding Cell 1–D was utilized inasmuch as plaintiffs presented evidence showing that an inmate had hanged himself to death in that holding cell in early November, 1974, some few

hours after having been booked into the jail.

The five holding cells numbered 1–D through 1–H housed at times as many as 115 individuals. From the evidence which was uncontroverted the Court finds that these holding cell facilities were absolutely inadequate. All inmates, if kept overnight, were required to sleep in their own clothes, without benefit of a mattress, blanket, sheet, pillow or towel. In the first 11 months of 1974, 17,806 inmates were housed in these holding cells. Inmates were kept under these conditions from one to eight days. There were no means for brushing their teeth or showering. There was no separation of any sort attempted by classification of these individuals. There were drunks, mental cases, homosexuals, first offenders, and recidivists. There was sometimes vomitus, urine and feces on the floor. Attempts were made to clean and mop regularly, but conditions were so bad that acceptable sanitation was impossible. Syphilis, gonorrhea, body lice, hepatitis, and broken bones were admitted in the holding cell mix. Lighting in the cells was and is still very poor. Meals were served at regular times, but conditions were so bad that food had to be eaten while standing because of lack of sitting space. Good sanitation was impossible under prevailing conditions, and the whole situation could only be classified, as did Dr. Kenneth Babcock, as "depraved", and as did Dr. Rowley, as "animal-like."

Charles Robert Sarver, plaintiffs' expert witness, stated that in his opinion the use of these holding cells for housing inmates for periods in excess of two hours should immediately cease and that the holding cells without bathroom and/or water facilities should not be used at all. This Court agreed. Mr. Sarver further stated in his opinion which was likewise supported by other evidence:

. . . that the space provided each individual inmate while being housed in the holding cell areas is to-

tally inadequate under any standard. . . . [t]his over-crowded condition and the other conditions existing in the holding cells presents an extreme danger to the physical and mental health of the inmates as well as an extreme danger to inmates from attacks by other inmates.

Plaintiffs presented evidence showing that in 1974 an inmate was killed by another inmate while being housed in one of these holding cells. Plaintiffs further presented evidence showing numerous incidents of brutality occurring· in holding cells 1–D through 1–H.

Louie Wainwright,[6] Director, Division of Corrections, State of Florida, testified in deposition that if it came to his attention that conditions existed as the Court found to exist in the holding cells at the Duval County Jail, he would have immediately gone to court to correct the noncompliance with Florida state regulations affecting county and municipal detention facilities which are regulated by the Department of Health and Rehabilitative Services, State of Florida.

### B—UPSTAIRS CELLS

Hygienic materials such as toothpaste, razor blades, razor, soap and other health and comfort items are provided to the inmates of the Duval County Jail through the jail commissary. It appears from the evidence presented on behalf of the plaintiffs that the opportunity to utilize the commissary was limited and, accordingly, it was obvious that there were times when individuals did not have hygienic materials available for even the most basic personal hygiene. If an inmate had funds available in his account maintained by jail personnel, he was required to purchase these items. In the event funds were not available to an inmate, these items were available through the "free" commissary. The Court notes that many of the items that were available for purchase were not furnished to indigent inmates through the "free" commissary.

Defendants presented evidence to show that since the institution of this suit, commissary privileges were available daily to those inmates who had been booked into the Duval County Jail during the past 24 hour period. Theretofore, an individual could have been without health and confort items and basic hygienic materials for a period of several days awaiting the periodic commissary privileges.

The evidence showed many incidents of frustrated attempts to obtain commissary items failing due to the order system from the commissary, aggravated by the shortage of jail personnel and resulting communications problems.

Charles Robert Sarver,[7] the plaintiffs' expert, indicated that all health and

---

6. Louie Wainwright, Director, Division of Corrections (now Department of Offender Rehabilitation), State of Florida; O. J. Keller (now succeeded by Emmett S. Roberts), Secretary of the Department of Health and Rehabilitative Services, State of Florida; and E. Charlton Prather, M. D., Director of the Division of Health, State of Florida, are also defendants but are not directly affected by this order. This Court, on November 8, 1974, granted plaintiffs' motion for partial summary judgment as to defendant O. J. Keller and ordered him to submit within 90 days from November 8, 1974, proposed rules and regulations prescribing standards and requirements with reference to (a) the number of county and municipal prisoners who may be housed in county and municipal detention facilities in the State of Florida per specified unit of floor space;

(b) the quality, quantity and diversity of foods served to such prisoners and the manner in which it is served; and (c) the confinement of such prisoners by classification, which rules and regulations are required by Fla.Stat. § 951.23 (1973). Those proposed rules and regulations have been submitted and the plaintiffs have filed timely objections thereto. However, this Court has not ruled on the plaintiffs' objections at this time.

It should be noted that the defendant Wainwright is recognized by this Court as a highly capable and qualified expert in the field of corrections, having appeared before this Court on numerous prior occasions.

7. Charles Robert Sarver is a lawyer as well as the former Director of Corrections of the State of West Virginia, and as such was the

comfort items available for purchase through the commissary should have been made available without cost to all indigent inmates and that all inmates throughout the Duval County Jail should have been provided commissary privileges on a daily basis. Again the Court agreed.

No more than one shower was available in any cellblock for use by individuals incarcerated in said cellblock. The number of inmates housed in each cellblock varied and, at times, as many as 24 individuals were required to utilize one shower. Individuals housed in the various isolation cells throughout the Duval County Jail, in theory, had access to a shower on a weekly basis. The Court, from the evidence, however, found that at times individuals housed in isolation were not given an opportunity to shower for a period of up to two weeks.

The number of sinks and commodes available to inmates varied from cellblock to cellblock. In the holding cells, one commode and one sink were available in those holding cells having such fixtures and there were two sinks and two commodes available in each of the 19-man medical cells. All of such fixtures throughout the jail were found by the Court to have been filthy and stained. The Court found that there was a serious problem for inmates in obtaining proper sanitizers in adequate quantities to perform the day-to-day task of cleaning the cells. The Court further found that soaps of the various types required for proper personal hygiene, belongings and surroundings, were not available on a regular basis. Mops were sporadically made available to the inmates for cleaning their housing areas, but were filthy and sour. From the evidence it appeared there were no adequate provisions for

distribution of cleaning materials, supervision of sanitation practices or maintenance of cleaning equipment.

The Court found from the uncontroverted evidence that the plumbing throughout the Duval County Jail was in a bad state of disrepair. Said disrepair resulted in day-to-day malfunctioning of commodes and water supplies, resulting in unhealthy conditions and, in some instances, dangerous conditions causing injuries to inmates. The evidence showed that there were several open drains in the various cellblocks and further evidence of serious injuries by inmates stepping in said open drains, all despite knowledge by jail personnel of the existence of these open drains. There was further uncontroverted evidence of serious injuries resulting from slips and falls due to water being present on the floor for weeks at a time encompassing 50% or more of a particular cellblock. The Court found that the plumbing repair problems, as well as the other day-to-day maintenance problems, in the Duval County Jail were attributable at least in part to the confusion arising as to who was responsible for said repairs. Defendants Carson, Page and Grant took the position that responsibility was that of the Consolidated City of Jacksonville, Department of Central Services, Division of Public Buildings. Said agency, however, was and still is within the executive branch and therefore under the control of defendant Mayor Hans Tanzler.

The Court heard considerable evidence with respect to the vermin problem in the Duval County Jail. Cockroaches, mice and rats were in abundance, and despite some attempt through the use of a contract pest control company to eradicate these nuisances, they are still present. The problem was found by the

chief executive and administrative officer of the state agency responsible for all juvenile and adult correctional institutions in that state. He was also the former Commissioner of the Arkansas Department of Correction, and as such was the chief executive and administrative officer of the Arkansas

Board of Corrections responsible for the operation of all adult correction institutions in that state. Mr. Sarver is presently an assistant professor at the University of Arkansas, Graduate School of Social Work, and the College of Law, teaching courses in the areas of law and corrections.

Court to be so severe that inmates sometimes passed their idle time trapping mice and rats. There was also evidence of rat and cockroach excretia in the kitchen and officer dining room areas located on the first floor of the jail.

The lighting throughout the inmate housing areas in the Duval County Jail was found by the Court to be deplorable and is still inadequate. The defendants introduced evidence showing that steps have been taken to improve the lighting in the Duval County Jail. This action was the apparent result of an anonymous donation for that purpose given to the Consolidated City of Jacksonville, conditioned upon the city appropriating additional funds to accomplish the job. Defendants further introduced evidence which is uncontroverted that the lighting with the improvements is now possibly too bright.

The ventilation throughout the Duval County Jail was found by the Court to present, and still is, a serious problem. Evidence was introduced showing that the temperature is noticeably different from floor to floor in the Duval County Jail. However, the ability to regulate the ventilation system does now appear to be possible by jail personnel themselves instead of being regulated by the Department of Central Services, Division of Public Buildings. Such condition the Court finds results in a constant health hazard being present which is further aggravated by the absence of any windows for fresh air or any provisions for inmates to leave the confines of the Duval County Jail. Both medical experts were of the opinion, and the Court still agrees, that the ventilation system should be checked by qualified personnel with an eye to improving said system.

Total outside physical communication is eliminated by the thick glass brick instead of window glass, and light transmission in some of the areas of the cellblocks is too poor for reading on a bright day. No provision is made for sunlight or fresh air.

No central sprinkling system exists in any part of the Duval County Jail and there is very limited ability to evacuate the jail due to structural design in the event of fire or other emergency. No evacuation plan existed nor were any evacuation exercises ever conducted involving either inmates or jail personnel themselves. Evacuation plans now appear to be in existence.

No adequate provision was found by the Court to have been made for furnishing inmates with sufficient clothing in the event of indigency or inability to obtain clothing from the "free world". It now appears that provision has been made to furnish adequate clothing to inmates.

Furniture available within the individual cellblocks in the Duval County Jail consists of a table, benches and bunks. With the present over-crowding in some cellblocks in the Duval County Jail, adequate space is not available for all inmates housed in those particular cellblocks to be seated at the table at the same time. In the two cellblocks formerly utilized to house female inmates, there were no tables at all and female inmates were required to eat either sitting on their bunks or the floor, all in close proximity to the commodes. At the present time, no females are housed in the Duval County Jail except on a holding cell basis. Adequate storage facilities still are not available for the storage of inmate belongings and the evidence showed that petty thievery among inmates resulted in a considerable amount of brutality.

The laundry facilities present at the Duval County Jail were found by the Court from the evidence to be inadequate and insufficient. The evidence showed that either through lack of communication with inmates or for other reasons most personal clothing of inmates was not laundered in the jail laundry, but was laundered in the cells by inmates themselves with hand soap and hung to dry in the already over-crowded day room area of the cellblocks. The laun-

dry was found to be operated by an inmate-trustee without any supervision whatsoever from jail personnel. The inadequacy of the laundry facilities and of communicated procedures resulted in a serious health and morale problem among the inmates housed in the Duval County Jail. A Law Enforcement Assistance Act (LEAA) grant was obtained in early 1973 to renovate a portion of the first floor of the Duval County Jail which included relocating the laundry room area and providing new laundry equipment. At the present time, some new laundry equipment is available in the Duval County Jail and all equipment needed to run the laundry is now in use under the supervision of a correctional officer. The absence of the equipment was attributable to a cost overrun in the construction of the laundry room and while the laundry room construction was completed, no funds were left available for the purchase of the equipment.

In summary, the overall environment of the inmate housing areas of the Duval County Jail gave one the psychological feeling of being trapped in a dungeon.

## C—OVERCROWDING

Excluding isolation cells, the Duval County Jail was constructed to house a maximum of 432 inmates. Evidence has been introduced indicating the inadequacy of space available in the event the maximum of 432 individuals is housed in the jail. On November 8, 1974, this Court ordered defendant O. J. Keller, Secretary of the Department of Health and Rehabilitative Services, State of Florida, to submit proposed rules and regulations prescribing standards and requirements with reference to the number of county and municipal prisoners who may be housed in county and municipal detention facilities in the State of Florida per specified unit of floor space. Without at that time finding whether the stated maximum capacity was acceptable, the Court emphatically

found from uncontroverted and overwhelming evidence that the Duval County Jail was and had been, for a considerable period of time, severely overcrowded. From the evidence, it appeared that on only one day during the first 11 months of 1974 were there fewer than 432 detainees present in the Duval County Jail. On several occasions during the same 11 months, the population exceeded 600. The Court finds that only on rare occasions from April 1974 through November 1974 was the population less than 100 over the stated maximum of 432.

The cellblock areas in the Duval County Jail were constructed with lock-in capability in the sleeping areas which consist primarily of four-man sleeping cells. The remainder of the cellblock contains the day room area with table and benches, shower, sink, trash can and television set, as well as one commode. As a result of the overcrowding, two bunks of bunk-bed type were present in every day room in the Duval County Jail and additional detainees were housed in the day room area with mattresses strewn on the floor. Dr. Samuel D. Rowley described the situation as "almost shoulder-to-shoulder housing".

The Court found from the evidence that the overcrowding at the Duval County Jail had existed for several years and that defendants Carson and Page knew or should have known of said overcrowding. Reports were introduced on behalf of plaintiffs from Grand Juries of the Fourth Judicial Circuit of Florida, in and for Duval County, Florida, indicating Grand Juries' awareness of the overcrowded conditions in the jail in years past. Numerous "Reports of Inspection of County Jails and County Prisons" prepared by the prison inspectors under the supervision of defendant Louie Wainwright, Director, Division of Corrections, State of Florida, indicated, and the Court found, that the jail as early as January 1973 was "already overcrowded". The jail increased the number of beds by 60 in February of

1974, which left the cellblocks badly crowded. At that time, the prison inspector noted that the overcrowding made it difficult to maintain a smooth operation. In April and June of 1974 the count in the Duval County Jail continued to climb with each inspection and with the overcrowded condition it was not possible to properly sleep all the inmates in the jail. The overcrowding caused a strain on jail personnel and the support areas which were required to service the inmates. Classification had suffered due to overcrowding and it was difficult to maintain a high level of housekeeping and sanitation. Defendants Sheriff Carson, Deputy Director of Prisons and Jails Page and Chief of Jails Grant all readily admitted to the overcrowding of the Duval County Jail and the surrounding problems resulting from the overcrowded conditions.

The Court found from the overwhelming weight of the evidence that the result of overcrowding throughout all parts of the Duval County Jail, which had existed for years, was that all inmates were confined under conditions which denied them any privacy, freedom of movement, or adequate space in which to sit, eat, work, or sleep. Inmates suffered both physical and psychological injuries from prolonged exposure to these inhumane, unhealthy and demeaning conditions.

### D—CLASSIFICATION SYSTEM

It was uncontroverted that housing assignments in the holding cells of the Duval County Jail were made solely on account of race, that is to say, there were all black and all white holding cells.

Upstairs housing assignments according to the defendants were made on the basis of 70% white to 30% black. The evidence, however, showed that the racial makeup of the population in the Duval County Jail was approximately 50% white and 50% black with frequent change as to which race was in the majority. Such an attempt to classify by race in the upstairs housing areas in the

Duval County Jail resulted in numerous all-black cells.

As heretofore indicated, the overcrowding in the Duval County Jail contributed to frustrate any reasonable attempt to classify detainees. Throughout the Duval County Jail there appears to have been no effective classification of inmates with respect to housing assignments at all, other than by race. Pretrial detainees were housed with convicted felons, juveniles were housed on the second floor of the Duval County Jail, which floor was designated by jail personnel as a violent felony offender floor. The juveniles were housed in a cellblock (2–C) which did not have showers available and the juveniles were showered in the area which contains adult violent felony offenders. From the evidence, it appeared that a juvenile was raped by an adult inmate during the course of the hearings on plaintiffs' motion which resulted in the preliminary injunction.

As heretofore indicated, this Court had entered an order on November 8, 1974, requiring defendant O. J. Keller, Secretary of Health and Rehabilitative Services, State of Florida, to submit proposed rules and regulations prescribing standards and requirements with reference to the confinement of county and municipal prisoners by classification. Such regulations required to be promulgated had to comply with Fla. Stat. § 951.23(2) (1973), and therefore provided for classifications which separated males and females, juveniles and adults, felons and misdemeanants, those awaiting trial and those convicted and, in addition, providing for the separation of unusual prisoners, such as the mentally ill, alcoholic or narcotic addicts, sex deviates, and suicide risks.

The Court found from the evidence that at the present time in the Duval County Jail the only classification which relates to the requirements of Fla.Stat. § 951.23(2) (1973), was that males were separated from females.

The Court further found from the evidence that isolation cells which had orig-

inally been designed as punitive isolation were used by jail personnel to separate those individuals who in the opinion of said personnel were in need of protection from others or from themselves. The Court was of the opinion and found that the isolation cells so utilized were not designed for that purpose and did not have adequate facilities to accomplish said purpose. The evidence further showed that there was serious confusion between the medical staff at the jail and the regular personnel at the jail with respect to the use of these isolation cells. It appeared that the regular personnel engaged in a practice of placing individuals in isolation and informing said individuals that the medical staff had requested such action. As a result, the medical staff was subjected to the brunt of inmate hostility arising from the confusion of being placed in these inadequate quarters.

These isolation cells were used for housing individuals having medical and psychiatric problems, but none of the cells had any special facilities for caring for the mentally or emotionally disturbed. The cells were not suited for medical isolation purposes.

The evidence presented at the hearing in this cause demonstrated that, on a daily basis, individuals charged with petty offenses were regularly housed throughout the jail with convicted felons who had been convicted of serious offenses such as rape, robbery or murder.

Plaintiffs presented uncontroverted evidence that, with respect to the use of the isolation cells for the first 29 days of September 1974, 60 individuals were placed in isolation. Three men were held in isolation for nine, 12 and 17 days, respectively, with no explanation. 18 individuals were placed in isolation but no "Incident Reports" were prepared and, accordingly, there was no indication of reasons why or by whom those 18 individuals had been placed in isolation.

## E—DUE PROCESS IN JAIL DISCIPLINE

At the time of the filing of this suit, the Court found that the Duval County Jail did not provide, to inmates, rules and regulations governing inmate conduct at any time during the period of their incarceration. During the course of this litigation, rules and regulations were promulgated governing inmate conduct, but the Court found said rules to be inadequate with respect to specificity of charges, failure to prescribe maximum penalties and failure to prescribe basic due process requirements to be complied with in the enforcement and administration of said rules.

The Court found that from the evidence with respect to due process in the Duval County Jail disciplinary scheme, no adequate provisions existed: (1) requiring rules specifying prohibitive conduct and the range of penalties for their infractions; (2) insuring adequate notice which fully advised the inmate proceeded against of the allegations comprising the claim against him; (3) insuring that any disciplinary hearing to be held before an impartial fact-finder and decision-maker; (4) insuring that an inmate had the procedure to be followed at the hearing adequately explained; (5) insuring that the inmate had the right to be heard and the right to support his contention with evidence; (6) insuring that the decision rendered by the fact-finder and decision-maker complied with the requirements of due process of law.

The uncontroverted evidence illustrated that named plaintiff Nitz was accused of "abusive language, disrespect and harboring feeding utensils and weapons" on July 15, 1974. The Court found that at that time no rules or regulations governing inmate conduct existed, but that as a result of the alleged conduct plaintiff Nitz was immediately placed in punitive isolation. On July 16, 1974, approximately 24 hours later, a hearing was held although the Court

found that there were no procedures for the conduct of said hearing and plaintiff Nitz was given five days in punitive isolation. The only documentation with respect to the alleged misconduct and subsequent hearing was an "incident Report" which was prepared at the time the alleged misconduct was discovered and which the Court noted was prepared by the correctional officer bringing said charges. The Court further noted that defendant Chief of Jails Grant who was the superior officer at the Duval County Jail was a member of the disciplinary committee.

The Court also found from the uncontroverted evidence that named plaintiff Marr was deprived of his "good time" and transferred from the Duval County Jail to the Duval County Prison Farm for an alleged infraction of the non-existent rules and regulations governing inmates' conduct, all without a hearing and, therefore, undoubtedly without due process of law.

### F—MEDICAL FACILITIES AND TREATMENT

The Court found that, even assuming that inadequate medical facilities and treatment were available to the inmates in the Duval County Jail, the procedure by which an inmate obtained medical assistance was totally inadequate. The decision as to whether or not an inmate was to receive medical assistance was ultimately left in the hands of a non-medical correctional officer. This result existed due to the inadequacy of the communications system existing for the communication by inmates to jail personnel. An inmate was required to write out a request to see a member of the medical staff and said request was handled by the one correctional officer on duty on each of the upper floors of the Duval County Jail. A majority of the time this sole correctional officer was responsible for all the inmates housed on a particular floor, which for the most part was in excess of 110 inmates. The evidence showed a trend of failure in these requests reaching the medical staff. The evidence further showed numerous occasions of an emergency nature where inmates were virtually helpless in their efforts to obtain the attention of a correctional officer to obtain the necessary medical assistance. This condition had, from the evidence, contributed to the deaths of several inmates.

As heretofore indicated, the medical facilities in the Duval County Jail located on the mezzanine floor consisted of a medical clinic, dental chair and three medical cells, each of which had a capacity of 19. The Court found that there were no x-ray facilities, no clinical laboratory, no convalescent or holding beds, no special diets for medical purposes, no physical therapy, no immunizations, no special cells for mental cases and that no inmate is given any sort of physical examination at the time of being booked into the Duval County Jail. However, many of these conditions have been rectified.

Health care for individuals incarcerated in the Duval County Jail was rendered by a physician present one-half day a week and by four registered nurses (one head nurse and three general duty nurses). Due to the shortage of nursing staff, there was no medical coverage whatsoever from 11:00 P.M. to 7:00 A.M. during the week or from 4:00 P.M. to 7:00 A.M. on week-ends. It appeared from the evidence that the part-time doctor rarely if ever visited the cells or cellblocks or made an inspection of sanitary conditions existing in the jail or the health conditions of the inmates receiving medical treatment.

In addition to the foregoing, a mental health team visits the Duval County Jail one day per week and sees certain referred cases and holds group therapy classes. Other than this team, there still is very little psychological or psychiatric care and the team provides only very limited care to a very small number

of inmates in need of such care. No psychologists or psychiatrists are members of the mental health team.

In short, the Court found from the overwhelming weight of the evidence that the medical care at the Duval County Jail was grossly inadequate. It was recommended by Kenneth B. Babcock, M.D.,[8] that there should be a full-time physician or, better, two half-time physicians which would enable better coverage for illnesses, absences and holidays. Such physician or physicians should be accessible 24 hours a day. Dr. Babcock further recommended that enough nurses, physicians assistants or medical technicians to have around-the-clock coverage should be required. He further recommended that a medical secretary or clerk be available to maintain medical records. Dr. Babcock further recommended that a full-time psychiatrist, two psychologists, and one or two psychiatric social workers, as well as a full-time sanitarian, and a half-time dentist and assistant be available.[9]

There appeared from the evidence to be a problem with respect to obtaining medication and small equipment necessary to provide adequate medical care to individuals incarcerated in the Duval County Jail.

Only emergency dental care was and still is provided by a part-time dentist available a portion of one day each week on Saturday. No dental assistant is available nor is there adequate equipment to provide anything other than emergency care. The nurse on Saturday duty is required to assist the dentist thus taking her from her medical duties.

The Court found that a very critical problem exists with respect to the hospitalization of individuals requiring same while being housed at the jail. At that time, there was no formal contractual agreement between the defendant Sheriff Carson and any hospital. However, there is such an agreement at this time. It appeared from the evidence that individuals in need of hospitalization or medical treatment beyond the capabilities at the jail were taken to University Hospital, operated by the Jacksonville Hospital Authority, an independent authority created by the laws of the State of Florida. There appeared to be a serious continuing misunderstanding on the part of the personnel from the Duval County Jail and the personnel at University Hospital with respect to referrals, admissions and returned patients from the Hospital to the jail. Guidelines of mutual understanding and respect were found by the Court not to exist. This situation was found by the Court to result in critical problems with respect to inmates with potentially contagious diseases. University Hospital, to which such individuals were referred, returned said individuals to the jail, which did not have any facility whatsoever for properly housing such patient-inmates. There was absolutely no facility existing in the Duval County Jail for post-operative patients, patients in casts, patients needing physical or rehabilitative care. The Court found from the evidence that several incidents of inmates diagnosed with having possible smallpox, chickenpox, impetigo, infectious hepatitis, and mumps being housed in the Duval Coun-

8. Kenneth B. Babcock, M. D. presently serves as an independent consultant on hospital-medical problems and in that capacity has contributed his expertise to the state correctional institutions of Minnesota, New Hampshire, Connecticut, Rhode Island, Mississippi, Illinois and Florida. He has been a surgeon for a period of ten years, a hospital administrator for a period of ten years and Director of the Joint Commission on Accreditation of Hospitals for ten years (1954–1964). On July 10, 1973, in the case of *Costello v. Wainwright*, 387 F.Supp. 324, this Court, by its order, established the Babcock Commission, consisting of Doctor Babcock and other doctors, which conducted a comprehensive health services survey of all correctional institutions and road camps maintained and operated by the Florida Division of Corrections.

9. In his progress report of April 23, 1975, Doctor Babcock changed his recommendations to the extent of recommending a part-time psychiatric consultant instead of a full-time psychiatrist.

ty Jail in general population, thus creating epidemic possibilities. Dr. Babcock stated, and this Court agreed, that "it is a sad state of affairs and needs immediate correction." Dr. Babcock, as well as Dr. Rowley, recommended that there was immediate need for a convalescent unit or infirmary available to the individuals housed in the Duval County Jail.

Both doctors also recommended, and the Court agreed, that every new inmate should undergo a complete physical examination by a medically trained person at the early stages of being housed in the Duval County Jail.

The medical clinic as it presently exists in the Duval County Jail is found by the Court to be inadequate, both in size as well as equipment available. Much of the equipment present is antiquated and of little use. There is need for additional space, personnel and equipment for a clinical laboratory and a physical therapy unit. There was and still is also a need as supported by the evidence to have specialists available such as dermatologists and ophthamologists on a part-time basis.

There is also the need for additional space, personnel and equipment for at least a half-time dentist and a dental assistant to provide more than just basic emergency dental care.

By way of illustrating the inadequacy of the medical care, the Court specifically bound from the evidence that named plaintiff Miller entered the Duval County Jail complaining of pain in his ear on June 4, 1974. He was not allowed to see a nurse until June 14, 1974, despite the fact that on June 4 it was noted by jail personnel in the booking process that plaintiff Miller needed medical attention and he was, in fact, referred to a nurse. It was not until June 18, 1974, that plaintiff Miller finally managed to see a doctor and receive penicillin to counteract an ear infection. This Court found it to be shocking that an individual must wait two weeks from the date of his original request to obtain medical treatment.

Named plaintiff Austin was admitted to the Duval County Jail on May 21, 1974, complaining of a broken arm and was referred by booking officers to the nurse. The nurse on the same date referred plaintiff Austin to University Hospital where a cast was placed on his broken arm. University Hospital medical personnel gave plaintiff Austin an appointment for the next day to have the nonfitting cast rechecked. Despite this appointment and request on the part of medical personnel at University Hospital, plaintiff Austin was not returned to that Hospital by jail personnel until June 12, 1974. Plaintiff Austin had on June 6, 1974, removed the cast from his arm himself because it had been giving him trouble.

The Court found from the uncontroverted evidence that in the event an inmate, regardless of ailment or charge pending against him, was transported to University Hospital for hospitalization, he was chained to the hospital bed while at said Hospital for treatment.

As the Court heretofore noted, there are three 19-man medical cells located on the mezzanine floor of the Duval County Jail. The Court found, as the various defendants have admitted, that these medical cells were and still are no different from other cells in the Duval County Jail and are medical in name only. The Court found these cells to be extremely overcrowded with two-tier bunk beds welded together to make, in effect, double beds. Commode and water facilities were grossly inadequate in these cells. As heretofore noted, there were no facilities to medically isolate contagious diseases and the population mix in the medical cells consisted of every imaginable ailment.

Inmates who were transported from the Duval County Jail to University Hospital were transported in a van which purported to be an ambulance. This Court noted from the uncontroverted evidence that said van had no medical equipment whatsoever and further that the van was not even equipped with

proper emergency signal equipment, but was rather equipped with police "blue lights".

It also appeared from the uncontroverted evidence that non-medical-type correctional officers on frequent occasions administered medication to inmates and on occasion mixed important medicine under improper names. All of the foregoing appeared from the evidence to have been done without any medical supervision whatsoever.

The Court found that preventive medical care in the Duval County Jail was non-existent and as previously noted, no medical examination was made to incoming inmates. On one occasion, the Court found that an individual hanged himself to death within four hours after having been booked into the Duval County Jail despite the fact that at the time of booking said individual informed the booking officers that he had been under psychiatric care on 12 prior occasions. The Court could only speculate as to whether or not this individual would have hanged himself in the event that a physical examination would have been provided by medically trained personnel at the time of booking so that proper care could have been provided.

The Court found that narcotic and alcohol addicts receive only the most minimal care with respect to the withdrawal caused by their addiction. For the most part it is "cold turkey".

With respect to individuals in need of psychological or psychiatric care, the Court found that there was a very minimal amount of rehabilitation of these people attempted because there were no trained personnel or proper facilities available. No facilities existed for proper and adequate confinement of suicidal or mentally dangerous inmates. De-

spite the fact that in many instances many individuals housed in the Duval County Jail had been ordered by state court judges to be "forthwith" transferred to the state mental hospital, these individuals remained in the Duval County Jail for periods of up to 90 days in conditions which this Court could not escape finding to be detrimental to said individuals' mental and physical well-being.

Plaintiffs presented testimony in the form of an affidavit of Robert L. Hebblewaite, an employee of the Division of Health, State of Florida, with respect to the dangerously high noise levels present in the Duval County Jail.[10] Mr. Hebblewaite's affidavit, which was uncontroverted, required the Court to find that the noise levels throughout the Duval County Jail were on the threshold of affecting hearing loss and that said noise levels and the character of the noises such as the operation of the television sets in the living areas, flushing the toilets, playing of radios, operation of showers and other constant noise levels were likely causing definite psychological and physiological defects and changes to the inmates housed in the Duval County Jail as well as the employees working in the jail. These noise levels still persist.

## G—FOOD AND ITS DISTRIBUTION

The Court found from unchallenged plaintiff evidence that the diet provided in the Duval County Jail was deficient and failed to meet the nutritional needs of adult persons. For example, a weekly cycle menu was evaluated and on the average, the menu provided 16% more servings of meat and 100% more servings of bread and cereal above the recommended standard. There was a fail-

---

10. Robert L. Hebblewaite has a B.S. degree from St. Lawrence University and a Masters of Public Health from the University of North Carolina. The witness has received additional training and attended courses in industrial hygiene and noise level sponsored by federal and state agencies. He is a member of the American Industrial Hygiene Association, American Conference of Government, Industrial Hygienist, Florida Public Health Association, and published a paper entitled "The Problem of Noise" in the Florida Society of Medical Technologists Periodic Magazine.

ure to provide the minimum requirements of Vitamin C 25% of the time and Vitamin A 50% of the time. The milk servings averaged only three-quarters of a cup per day which included the milk used in cooking and all of which was 75% below the recommended standard.

No dietician or nutritional expert was available on any regular basis at the Duval County Jail nor had any personnel working in the kitchen received any formal training in the area of food service supervision, although a course was regularly provided by the Consolidated City of Jacksonville, Public Health Division. All food was served and handled by inmate-trustees and correctional officers who did not have health certificates from the Division of Health, State of Florida, as required by Rule 10B–8.-07(2), Rules and Regulations of the Department of Health and Rehabilitative Services, State of Florida. There was only the most minimal supervision of the inmate-trustees who performed the primary duties required to prepare the approximately 1,800 meals per day prepared in the Duval County Jail. The Court finds that only three correctional officers were and still are available for providing seven day per week supervision of the approximately 30 inmate-trustees working in the kitchen area.

The Court found that coffee was served only once a day in the very early morning hours and that it was common practice for inmates to hoard leftover coffee in cardboard milk cartons and attempt to heat the same with toilet paper during the remainder of the day. This practice, the Court found, resulted in a serious smoke and fire hazard as well as a health hazard inasmuch as the heating practice occurred in the commode area of the cellblocks. Plaintiffs' witness Mr. Sarver was of the opinion, and this Court agreed, that there was no excuse for not providing coffee 24 hours per day to inmates.

The kitchen facilities at the jail were found to be completely inadequate and failed to comply with minimal health standards. Most of the equipment was and still is antiquated resulting in daily malfunctioning and that which is available is too small to accomplish the job. During the first six months of 1974, 303,643 meals were prepared in the jail kitchen at an average cost per meal of 32¢.

The freezers available in the Duval County Jail are still wholly inadequate and not operating properly, resulting in temperatures not being kept at acceptable standards. The early 1973 LEAA Grant obtained to renovate a portion of the first floor of the Duval County Jail included housing and equipment for better freezers. Due to the cost overrun in constructing the space to house the freezers, the new freezer equipment is still not available.

No equipment or facilities were available for providing special diets for those with special diet requirements as a result of medical and/or religious reasons.

Food served in the Duval County Jail to inmates was cold and was fed to detainees in the unsanitary holding cells and cellblocks. Food was served by inmate-trustees from open unheated food carts. The food was loaded onto the carts in the hallway area adjacent to the kitchen which was unfortunately also adjacent to the door to the county court catwalk with its tremendous traffic flow of individuals being transferred to court for bond hearings and other court proceedings. It clearly showed from the evidence that the location of this door was at least in part attributable to the lack of effective communication between the Office of the Sheriff and other agencies within the executive branch of the Consolidated City of Jacksonville government. The need for adequate food carts, the lack of which results in a serious morale problem among all inmates, has long been known to personnel at the Duval County Jail. Complaints of food being cold when served as well as the need for food carts and updated kitchen equipment to replace that which is obso-

lete had been noted periodically since January 1973 in the Division of Corrections "Inspection Reports".

As heretofore noted, all meals were and still are served in the holding cells or housing cells as the case may be. The Court found from the evidence that these cells are too unsanitary for feeding; and due to the overcrowded conditions as well as the shortage of jail personnel, a real problem of inmate theft of other inmates' food existed resulting in almost day to day incidents of brutality. Dr. Rowley [11] recommended, and this Court agreed, that combined recreational and dining areas should be created on each floor of the jail.

It was clear from the evidence, and the Court also found, that the vermin and insect problem existing throughout the Duval County Jail also existed in the kitchen area. The Court further found that there was only minimal supervision of any routine cleaning schedule for the food service areas and that the existing provisions for sanitation supervision meant very little to anybody in authority. There was and still is a serious need for a comprehensive maintenance and sanitation program to be instituted in the Duval County Jail.

Adequate storage room for proper storage of food service items was and still is not available. Two dry foodstuff storage closets are still provided but due to the inadequacy of the facility one of these areas is located on the fourth floor, almost as far removed from the kitchen as one could locate it.

The Court noted that all inmates except trustees were served only two meals per day and were provided only sandwiches for lunch.

### H—PHYSICAL BRUTALITY

Plaintiffs presented only minimal evidence of physical brutality by correctional officers to inmates, although incidents of brutality by inmate *on inmate*

are still daily occurrences and will be dealt with hereafter.

### I—RECREATIONAL, EDUCATIONAL AND TRAINING FACILITIES

There were no pretrial intervention programs, employment programs or work release programs for pretrial detainees in the Duval County Jail. There still is no gymnasium or other recreational facilities. The day room portion of the various cellblocks or the four-man sleeping cells are the 24 hour per day confines of the detainees in the jail except for a two hour period each week. Individuals are allowed to leave the cellblock areas only for court appearances, trips to the medical clinic and the two hour recreational period hereinbefore mentioned. These critically overcrowded cellblocks provide the major recreational area available to the inmates and the only suitable recreational activities provided in the cellblocks are cards, dominos and television. There are no other recreational programs or facilities available inside the Duval County Jail. The typical daily schedule of an inmate housed in the Duval County Jail still consists primarily of being awakened, fed and turning off the television by the end of the first late show at night.

Some attempts are being made to provide a GED educational program, and various rehabilitation efforts by volunteers and volunteer organizations. There is, however, such a limitation of the facilities available that the effect of any such program is seriously questioned by this Court. Lack of adequate jail staff has hampered efforts for the rehabilitation of the inmates.

The Court finds from the evidence that there is an extreme need for recreational facilities in the Duval County Jail. The Court finds from the evidence that the property located immediately adjacent and southeast of the jail itself is owned by the Consolidated City of

11. Samuel D. Rowley, M.D., is the Chief of the Public Health Division for the Consolidated City of Jacksonville.

Jacksonville and utilized for the Jacksonville Sheriff's Office parking and storage. The various experts involved in this litigation all recommended expansion of the facilities for recreational purposes and this property as well as the roof of the jail were mentioned as possible sources. It is to be noted that attempts in the past were made to utilize the roof but this effort resulted in the need for very expensive roof repairs. At the present time, the aforementioned parking lot is used for a period of four hours each week.

As heretofore noted, the inmates have limited exposure to either sunlight or fresh air in the jail and the only outside light is transmitted through translucent windows.

Defendant Louie Wainwright, Director, Division of Corrections, State of Florida, testified in deposition that if rehabilitation is to occur it had to commence at the first instance of contact with the criminal justice system. This Court found from the combined evidence in this cause that inmates housed in the Duval County Jail were not being rehabilitated and further that if an individual detainee was desirous of rehabilitating himself the overall conditions existing in the Duval County Jail would have made this individual effort an impossibility. These overall conditions still render it very difficult for an individual inmate to rehabilitate himself.

## J—READING MATERIALS

The library and library facilities at the Duval County Jail are still found by this Court to be inadequate. Supervision of the library, such as it is, is now left in the hands of a correctional officer who has some training in the area. Total confusion among jail personnel as to what reading materials inmates were allowed to possess and the manner in which they obtain them was apparent. Daily newspapers were not available and books, papers or magazines were not allowed to be brought into the Duval County Jail by visitors for inmates but could only be received from the publisher. This policy has been corrected so that inmates may receive reading materials from any source. The library at the Duval County Jail consisted primarily of a few novels and outdated periodicals, all of which had been donated. The facilities available for an adequate library were not present. While the library facilities are still not adequate, they have been expanded somewhat.

The improved library is emphasized and made more critical due to the almost total lack of any other meaningful programs in this institution.

## K—GUARD CONTROL AND SUPERVISION

The understaffing at the Duval County Jail was and still is inescapably apparent from the hearings in this cause. The number of correctional officers available still is insufficient for the most minimal observation and protection of inmates or even to assist inmates in properly obtaining the basic necessities of life. To compound the critical personnel shortage available for the day-to-day operation of this facility is the fact that there was an annual turnover rate among these employees of 40% or more, which turnover rate has abated somewhat. Clearly contributing to the high personnel turnover rate is the dramatic disparity in starting salaries between correctional officers and law enforcement officers all employed by the Jacksonville sheriff's office. The monthly disparity was in excess of $150.00 and is now about $100.00.

An additional complication to the critical personnel problem is the fact that there is no meaningful training program provided for new correctional officers. The selection process for hiring correctional officers is seriously questioned from the evidence. Limited psychological testing is now being utilized in this process. From portions of present em-

ployee personnel records introduced by plaintiffs, the suitability of many of the present correctional officers for correctional work is highly suspect.

The maximum security design of the Duval County Jail, even in the upstairs housing areas, contributes substantially to the inmate supervision problem. All cellblocks on upper floors are constructed so as to prevent eye contact with inmates without an overt effort on the part of a correctional officer. To supervise inmates properly requires an officer either to open a door to the cellblock or to proceed to an inconveniently located catwalk to inspect the cellblock areas. As heretofore noted on these floors of the jail, supervision of in excess of 110 inmates was formerly left to one correctional officer and to two inmate-trustees with occasional assistance from a newly hired correctional officer who is undergoing "on-the-job training" from the regularly assigned correctional officer. This sole floor officer was responsible for providing security, protection of inmates and providing the basic necessities such as food, mail, library, commissary, telephone communications, sick call, court appearances, writing paper and every other means for access to courts and/or the free world. From the evidence it is apparent there are many occasions when inmate-trustees were left in charge of a floor of in excess of 110 inmates due to the demands of a correctional officer to leave the floor for various reasons. The use of inmate-trustees to transport inmates from one floor of the jail to another was also apparent.

The plaintiffs' expert witness, Mr. Sarver, an expert in the field of corrections involved in these hearings, recommended that at all times a correctional officer should be assigned to supervise the activities in each separate cellblock of the upper floors of the Duval County Jail in order to provide inmates proper supervision and protection and to provide the basic necessities of life. In Mr. Sarver's original opinion an increase from the one floor officer now present should be made to result in the following:

| | |
|---|---|
| Mezzanine Floor | Five Cellblock Officers and one Control Officer (rank of Sgt.) on duty at all times. |
| Second Floor | 10 Cellblock Officers and one Control Officer (rank of Sgt.) on duty at all times. |
| Third Floor | Nine Cellblock Officers and one Control Officer (rank of Sgt.) on duty at all times. |
| Fourth Floor | Nine Cellblock Officers and one Control Officer (rank of Sgt.) on duty at all times. |

However, this opinion was modified somewhat.

The foregoing complex personnel crisis at the Duval County Jail, compounded by the design of the structure and the overcrowded conditions, resulted in a daily horror show of violence. Rapes, assaults and attempted suicides were a common occurrence in this institution. Plaintiffs introduced evidence in the form of "Incident Reports" prepared by jail personnel documenting in excess of 150 occasions of brutality in January–November 1974, the majority of which incidents resulted in the need for medical care to injured inmates. Plaintiffs introduced "Incident Reports" showing that even during the course of the hearings in this cause incidents of violence were occurring in the Duval County Jail.

From the totality of the evidence it is impossible for this Court not to conclude that many of the other problems existing in the Duval County Jail were and still are attributable to the personnel problem. The inability to provide adequate medical care, food services, sanitation practices, recreational and rehabilitative efforts cannot be changed without

a solution to the staffing crisis. As a 1969 "Report of Grand Jury Relating to the County Jail of Duval County, Florida," observed, with which this Court agrees, ". . . the operation and management of the Jail should be in business-like fashion. We consider the Sheriff the President of a big corporation and the taxpayers as stockholders of this corporation." The same Grand Jury concluded that the sheriff did not have knowledge of the conditions of the jail at that time due to his failure to regularly visit the jail. From evidence presented by plaintiffs it affirmatively appears from the sheriff's own admission in deposition that he had not been present in the Duval County Jail but two times in a 16-month period ending in August 1974. The absence of regular visits occurred despite defendant Sheriff Carson's representation to the aforesaid Grand Jury in response to their Report that he would inspect the jail personally on a monthly or semi-monthly basis for the purpose of verifying "Inspection Reports" prepared by prison inspectors for the Division of Corrections, State of Florida. Plaintiffs introduced such Reports for a five-year period and as this Court has on several occasions found, present conditions were referred to and criticized by these Reports.

Plaintiffs further introduced unequivocal evidence that despite a budgetary appeal procedure available to the sheriffs in the State of Florida pursuant to Fla.Stat. § 30.49, defendant Sheriff Carson has never utilized this appeal procedure. The procedure provides for appeals to a state agency in the event a sheriff in Florida does not in his opinion obtain adequate funds to perform his office from the local legislative branch and which procedure specifically refers to inadequate budgets for operating county jails.

The evidence shows that for the last five fiscal years the following sums were provided from defendant Carson's budget for the operation of the Duval County Jail. The percentages reflect the percentage each sum was of the total budget of the Jacksonville Sheriff's Office:

| FISCAL YEAR | TOTAL BUDGET | PERCENTAGE |
|---|---|---|
| 1974–1975 | $1,938,677.00 | 8.9% |
| 1973–1974 | $1,556,970.00 | 9.1% |
| 1972–1973 | $1,529,034.00 | 9.8% |
| 1971–1972 | $1,333,763.00 | 9.2% |
| 1970–1971 | $1,057,286.00 | 8.7% |

## L—VISITATION AND COMMUNICATION

Visitation privileges at the Duval County Jail were limited to two hours on one day of each week and were confined only to members of an immate's immediate adult family. Visiting hours still occur on Saturdays from 12:30 P.M. to 2:30 P.M. and on Sundays from 12:30 P.M. to 2:30 P.M. Visiting facilities still consist of three small scratched and cloudy visiting windows in each cellblock with malfunctioning speaker boxes below. The construction of the windows and speakers is such that there can be no eye contact at the time of the verbal communication. Visitors and inmates alike are required to shout to be heard and the arrangement prevents any privacy or physical contact whatsoever. There appears to be almost no supervision of visiting by jail personnel, undoubtedly resulting in inequities in obtaining a window due to the overcrowded condition. With respect to the practice of providing contact visits in the state prison system housing only convicted felons, defendant Louie Wainwright testified in deposition that of the 11,500 inmates in that system only 500 are not allowed weekly contact visits with families for an eight-hour period. It was defendant Wainwright's opinion that contact visits are desirable and an effective rehabilitative tool. This Court notes that the vast majority of individuals housed in the Duval County Jail are being held in pretrial detainee status, and it would be impossible for this Court to conclude that all prospective

witnesses in a defendant's behalf are immediate members of a defendant's adult family.

The evidence showed that facilities exist at the Duval County Jail for delivery of clothing, health and comfort items and money for inmates, but were limited in that such items can only be delivered to the institution between 12:30 P.M. to 7:30 P.M. during weekdays. It appeared from the uncontroverted evidence that the only reason these hours are limited and exclude week-end hours was due to the shortage of jail personnel.

The evidence showed that incoming mail was opened for the purposes of inspecting for contraband and funds being forwarded to an inmate's account. Outgoing mail was generally not opened. During the course of the hearings in this cause, the plaintiffs introduced evidence of the opening of mail from an inmate to plaintiffs' counsel as well as counsel's correspondence to the inmate by personnel employed by defendant Carson at the Jacksonville Correctional Institution. The Court cannot help but note the possibility of censoring mail if the practice of inspecting mail occurs.

Telephone privileges are provided to inmates in the cellblock areas of the Duval County Jail on a cell-by-cell rotating basis. It appears from the evidence which is uncontroverted that telephone calls were monitored by loudspeakers located at the control desks on the upper floors of the jail. Presumably all telephone calls, including calls to attorneys, were at least from time to time monitored by jail personnel and others who might be present in the vicinity of the monitor speaker. It appears from the evidence that telephone privileges were denied entire cellblocks for conduct engaged in by only one or two inmates housed in a particular cellblock. The same practice of terminating the privilege of television also occurred.

## M—RELIGIOUS FREEDOM

As heretofore noted, persons whose religion imposed dietary restrictions were not allowed any special diet. From a review of the menus filed in the record of this cause it was apparent that pork was served as a main dish or used in seasoning other dishes in virtually all meals. While the evidence was somewhat unclear there appeared to be confusion among jail personnel as to whether or not adherents to particular faiths are able to obtain religious periodicals and holy books. There is no facility for chapel service or any organized religious services available in the Duval County Jail.

## N—IMPAIRMENT OF DEFENSE AT TRIAL

The evidence shows that only the following law books were present in the Duval County Jail but the evidence further showed that there was apparent confusion and communications problems with respect to an inmate obtaining the use of said law books:

Three sets of Florida Statutes (1973)
One Black's Law Dictionary
Florida Rules of Court (what edition unknown to this Court)
Consolidated City of Jacksonville Municipal Code, Volumes 1 and 2 (what edition unknown to this Court)

The plaintiffs' expert witness, Charles Robert Sarver, an attorney and corrections expert, was of the opinion that a law library should be available consisting of at least:

United States Reports
Southern Reporter
Florida Statutes Annotated
Florida Jurisprudence
United States Code Annotated
Florida Rules of Criminal Procedure
Federal Rules of Criminal Procedure
Federal Rules of Civil Procedure
Jacksonville Municipal Code
Black's Law Dictionary

and an assortment of works dealing with criminal law, constitutional law and habeas corpus practice.

There was evidence that a federal prisoner desiring to file a petition for writ of habeas corpus in this Court was not able to obtain a notary public for the purposes of notarizing the petition, which is a requirement of this Court. Defendants introduced evidence to the effect that there were 13 correctional officers who were active notaries. The evidence shows that while these officers had been instructed to notarize federal writs, etc., no procedure appeared to have been communicated to inmates or other jail personnel as to how to accomplish the task.

Plaintiff Richard Franklin Miller, who commenced this litigation by his *pro se* "Petition for Injunction", complained by affidavit of the inability to obtain writing material for access to this Court. In fact, plaintiff Miller obtained the items necessary to file his petition by trading tobacco and being loaned a pencil and six sheets of paper by another inmate.

Attorney-client telephone calls were potentially monitored and attorney visits were restricted to exclude visits during the daily feeding hours or family visiting hours or after 9:00 P.M. Attorney visits were conducted in one of two small cubicals on each upper floor with a steel bench and one delapidated chair. The cubicals were originally constructed to allow visiting from the other side through a visiting window and speaker, but at present attorney and client are locked in the room together without being overheard. On the first floor of the Duval County Jail the only facility available for attorney-client conferences was that of a multi-purpose room utilized for various other purposes. However, there are now two such rooms for attorney-client conferences.

As heretofore noted, inmates were and still are prevented from communicating with potential witnesses due to the limitation of visiting hours and regulations limiting potential visitors.

## O—PSYCHOLOGICAL EFFECTS OF DETENTION IN THE DUVAL COUNTY JAIL

The Court found from the totality of the evidence with specific reliance on the various experts presenting evidence in this cause that the damage to plaintiffs and the class they represent by the conditions of the Duval County Jail outlived their stay in that institution. Psychological damage resulted due to the intense overcrowding, the unsanitary living conditions, the lack of adequate recreational facilities, the long hours of idleness, the deficient health program, the almost total lack of contact with the free world and the daily deprivations resulting from the lack of adequate numbers of properly trained jail personnel.

## P—OTHER ITEMS

### Catwalk

The court catwalk areas leading from the Duval County Jail to the county and circuit courts located in the Duval County Court House were found from the evidence to be inadequate and filthy with indication of very little care being provided to maintain this area. While it did not appear from the evidence which of the various defendants is responsible for maintenance of these areas, it was clear that the defendant Carson was so responsible. Detainees awaiting court appearances were required to sit on the floor without any facilities for sitting other than the floor in the catwalk area leading to the county court rooms. This condition existed despite the fact that these court rooms were constructed and put into operation in 1974. Individuals awaiting court appearances remained in these conditions for the majority of a day.

### Master Population Board

A "master population board" is present in the control center located on the first floor of the Duval County Jail and is required by Rule 10B–8.12, Rules and Regulations of the Department of

Health and Rehabilitative Services, State of Florida. Said rule requires that the "master population board" indicate the various sections of the detention facility and account for the inmates in the respective assigned sections. From the evidence the "master population board" present in the Duval County Jail still does not accomplish what is required.

Fla.Stat. § 951.06 (1973)

Fla.Stat. § 951.06 (1973) provides in part:

(1) The county commissioners shall employ a captain or warden and such guards as they deem necessary, pursuant to standards for employment established and administered by the division of corrections.

(2) All captains or wardens of prisoners shall see that all rules and regulations prescribed by law or the division of corrections are fully observed and complied with . . .

Rule 10B–8.03, Rules of the Department of Health and Rehabilitative Services, State of Florida, provides the standards for employment referred to in Fla.Stat. § 951.06(1) (1973). Defendants readily admitted non-compliance with the provisions of Rule 10B–8.03 and therefore the provisions of Fla.Stat. § 951.06(1) (1973). Defendant Sheriff Carson in response to an interrogatory with respect to said compliance stated that the "law in this area (or at least ability of local agencies to comply therewith) seems uncertain."

The Court further found from the evidence that no adequate provision had been made requiring employees employed in the day-to-day operation of the Duval County Jail to be familiar with all the rules and regulations referred to in *Fla. Stat.* § 951.06(2) (1973).

Fla.Stat. § 39.03 (1973)

Fla.Stat. § 39.03 (1973) entitled: "Taking a child into custody; detention" provides in part with respect to housing juveniles in adult detention facilities and accordingly the practice of housing some juveniles in the Duval County Jail:

(5)(b) Commencing January 1, 1974, the judge may not make an order directing the delivery of a child to a jail or other facility intended or used for the detention of adults, except:

1.a. When jurisdiction of the matter as a juvenile case has been waived or removed pursuant to § 39.02(6), *or*

b. When the Court determines, upon the recommendation of the superintendent of the detention home and an intake officer, that the child is beyond the control of the detention home staff, *and*

2. The receiving facility *contains a separate section for juvenile offenders and has an adequate staff to supervise and monitor the child's activities at all times.* (emphasis added)

The shocking evidence in this case with respect to juveniles housed in the Duval County Jail led this Court to the finding that the housing of juveniles in the jail violated the provisions of Fla.Stat. § 39.-03(5)(b) (1973)

Rule 3.125, Florida Rules of Criminal Procedure

Rule 3.125, Florida Rules of Criminal Procedure, requires that rules and regulations of procedure governing the exercise of authority to issue notices to appear shall be established by the chiefs of the respective law enforcement agencies having jurisdiction in order to implement effectively the provisions of that rule. The rule provides for issuance of notices to appear which notices are defined as a written order issued by a law enforcement officer in lieu of physical arrest requiring a person accused of violating the law to appear in a designated court or governmental office at a specified date and time. Of concern to this Court was the proper implementation of said rule inasmuch as it appeared to this Court to be an effective remedy to the overcrowded conditions which existed at the Duval County Jail.

The Court noted that the rules and regulations promulgated by defendant Carson for the purpose of complying with Rule 3.125, Florida Rules of Criminal Procedure, specifically excluded the offenses of drunkenness, public affray, unlawful assembly, habitual offender and shoplifting from the application of said rule.

Rule 3.130, Florida Rules of Criminal Procedure

Rule 3.130, Florida Rules of Criminal Procedure, entitled: "Pre-Trial Release" provides in part:

(b) *First Appearance.*

(1) *Prompt First Appearance.*

Except when he has been previously released in a lawful manner, every arrested person *shall be taken* before a judicial officer within twenty-four (24) hours of his arrest. (emphasis added)

The evidence in this cause reflected that it was possible an arrestee would not be taken before a judicial officer for as long as 31 hours after arrest. This result was a clear violation of Rule 3.-130, Florida Rules of Criminal Procedure.

*Rules of the Department of Health and Rehabilitative Services entitled: "County and Municipal Detention Facilities"*

The Court specifically found that defendants Carson, Page and Grant had violated the provisions of the following rules adopted by the Department of Health and Rehabilitative Services, State of Florida, and entitled: "County and Municipal Detention Facilities". Pursuant to *Milwaukee Mechanics Insurance Company v. Oliver,* 139 F.2d 405 (5th Cir. 1944), this Court took judicial notice of said rules:

1. 10B–8.02(2) *General Provisions.*

(2) These rules and regulations shall be posted or made available where they will be visible to all employees, inmates and visitors to a detention facility. The officer-in-charge is encouraged to prescribe written local rules and regulations to supplement these rules and regulations, and he shall prescribe such rules and regulations governing inmate privileges. Such local rules and regulations should be thoroughly explained to each inmate.

2. 10B–8.03 *Commission Standards and Procedures.*

(1) All employees and all other persons who will exercise supervision or control over inmates except sheriffs and their bonded deputies, must be approved by the director, such approval being in the form of a commission.

3. 10B–8.04 *Employee Regulations.*

(1) Each officer-in-charge shall be responsible for insuring that each employee, before assuming the duties of his employment, is familiar with all rules and regulations of the department, division and institution which pertains to such employee, and to the custody, control, care and treatment of inmates under his supervision and control. Each employee shall keep himself completely familiar and comply with all such rules and regulations during his employment.

4. 10B–8.07 *Food.*

(1) All inmates shall be given three substantial and wholesome meals daily.

(2) All persons, including inmates, shall have health certificates from the Division of Health before being allowed to directly handle food or kitchen equipment.

5. 10B–8.08 *Medical Attention.*

(1) Inmates shall be furnished such food as is prescribed by the attending physician.

(2) Whenever practicable, the officer-in-charge of a detention facility shall obtain a satisfactory arrangement with the nearest available hospital for the admission and treatment of inmates on both a routine and an emergency basis. Whenever practica-

ble, similar arrangements shall also be made with a physician.

6. 10B–8.09 *Clothing and Bedding.*

(2) Inmates shall be furnished mattresses, sheets or mattress covers, and pillow cases if pillows are used. . . . All items so furnished shall be cleaned when necessary.

7. 10B–8.11 *Privileges.*

(3) An area for interview between an inmate and his attorney shall be provided and arranged in such a manner as to insure privacy.

(5) The local rules and regulations should be adopted to permit visits by identified members of the inmate's relatives and family, his pastor, business visitors; and in the case of an inmate awaiting trial, persons with whom he may wish to confer in order to prepare the defense of his case.

(7) Children should not be permitted to visit unless they are members of the inmate's immediate family and accompanied by an adult.

(12) The officer-in-charge is encouraged to make available to inmates suitable and proper magazines, newspapers and books whenever practicable.

(13) Where facilities permit, inmates should be encouraged to spend leisure time in hobbies, arts and crafts.

8. 10B–8.12 *Security and Control.*

(11) All reasonable precautions shall be provided for the safe-keeping, safety and welfare of inmates who are escape risks, or who have suicidal tendencies, or are emotionally disturbed, or acutely intoxicated, preferably with confinement or close surveillance near the control center of the facility.

9. 10B–8.13 *Sanitation.*

(7) Sanitation inspections of both facilities and inmates shall be made as frequently as is necessary to insure against the presence of unsanitary conditions. New inmates should be carefully classified, with adequate segregation and treatment given as needed.

(8) Food storage and refrigeration shall be maintained in a sanitary condition and adequate provisions made for protecting food from insects, rodents, dust and decay and other destructive forces.

10. 10B–8.14 *Order and Discipline.*

(13) The officer-in-charge or his designated representative shall see and talk to each inmate in disciplinary confinement at least once each morning and once each afternoon. At each of these times the inmate's general condition and attitude shall be ascertained and noted in writing, signed and placed in the inmate's file and shall be made available to prison inspectors upon request.

*Comparison of the Duval County Jail to the State Prison System*

This Court in the past several years has become very familiar with the conditions existing in the Florida state prison system, having handled numerous cases involving the conditions of the various institutions comprising the state system. The state system is operated by the Division of Corrections, Department of Health and Rehabilitative Services, State of Florida. The totality of circumstances present at the Duval County Jail were found by this Court to have produced conditions significantly inferior to those existing within the Florida state institutions. The Court is aware that those individuals incarcerated in the penal institutions are convicted felons while the vast majority of individuals incarcerated in the Duval County Jail are pre-trial detainees.

IV. LACK OF RESOURCES NOT A JUSTIFICATION FOR DEPRIVATION OF CONSTITUTIONAL RIGHTS

Before this Court embarks upon a discussion of the specific provisions to be included in this Court's per-

manent injunction, one additional very basic well-established principle should be reiterated. That principle is simply that "[l]ack of funds is not an acceptable excuse for unconstitutional conditions of incarceration." *Finney v. Arkansas Board of Correction*, 505 F.2d 194, 201 (8th Cir. 1974). To the same effect are: *Hamilton v. Love*, 328 F. Supp. 1182, 1194 (E.D.Ark.1971) ("Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights."); *Holt v. Sarver*, 309 F.Supp. 362, 385 (E.D.Ark.1970), aff'd 442 F.2d 304 (8th Cir. 1971) ("The obligation of the Respondents [prison officials] to eliminate existing unconstitutionalities does not depend upon what the Legislature may do."); *Gates v. Collier*, 501 F. 2d 1291, 1320 (5th Cir. 1974) ("Shortage of funds is not a justification for continuing to deny citizens their constitutional rights."); *Wyatt v. Aderholt*, 503 F.2d 1305, 1315 (5th Cir. 1974) ("The state may not fail to provide treatment [which the Court found to be constitutionally required] for budgetary reasons alone."); *Jackson v. Bishop*, 404 F.2d 571, 580 (8th Cir. 1968) (Blackmun, J.) ("Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations."). *See also Rozecki v. Gaughan*, 459 F.2d 6, 8 (1st Cir. 1972); *Watson v. City of Memphis*, 373 U.S. 526, 537, 83 S.Ct. 1314, 1321, 10 L. Ed.2d 529 (1963) (". . . vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny [them] than to afford them."—desegregation of public parks).

The Fifth Circuit most clearly enunciated these sentiments in the following excerpt from *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974):

> Where state institutions have been operating under unconstitutional conditions and practices, the defenses of fund shortage and the inability of the district court to order appropriations by the state legislature, have been rejected by the federal courts. In *Holt v. Sarver*, 309 F.Supp. 362 (E.D.Ark. 1970), aff'd, 442 F.2d 304 (8th Cir. 1971), an installment of the Arkansas prison litigation, the district court stated:

>> "Let there be no mistake in the matter; the obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. *If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States.*" 309 F.Supp. at 385 (Emphasis supplied).

See *Watson v. City of Memphis*, 373 U.S. 526, 537, 83 S.Ct. 1314, 1321, 10 L.Ed.2d 529 (1963) (". . . vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny [them] than to afford them."—desegregation of public parks); *Rozecki v. Gaughan*, 459 F.2d 6, 8 (1st Cir. 1972) ("Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations."—prison heating system); *Jackson v. Bishop*, 404 F.2d 571, 580 (8th Cir. 1968) ("Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations . . ."—rehabilitative devices); *Hamilton v. Love*, 328 F.Supp. 1182, 1194 (E.D. Ark.1971) ("Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights."—pre-trial detention unit). On the contrary, appellants cite no cases in support of their contention that the relief fashioned by the trial court cannot be granted.

It seems that the most onerous aspect of the district court's judgment,

as far as the State of Mississippi is concerned, is that compliance will cost the State a considerable amount of money. *But the district court did not require that the legislature appropriate monies for prison reform; it simply held, in keeping with a plethora of precedent on the fund shortage problem, that if the State chooses to run a prison it must do so without depriving inmates of the rights guaranteed to them by the federal constitution.*

\* \* \* \* \* \*

Therefore, we cannot agree that the relief here granted was impermissible. Having found these numerous constitutional violations, which were even conceded by the appellants, the court had the duty and obligation to fashion effective relief. In such circumstances, the trial court is allowed wide discretion. "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Board of Educ.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). The relief ordered by the trial court was tailored to alleviate the deplorable practices and conditions of Parchman. Shortage of funds is not a justification for continuing to deny citizens their constitutional rights.

*Id.* at 1319–1320.

■ Throughout this litigation, the defendants have repeatedly raised the spectre of inadequate resources to accomplish certain provisions of this Court's preliminary injunction regarding such items as contact visitation, daily recreation, guard control and medical facilities and treatment in the light of the limitations imposed by the present structure which serves as the Duval County Jail. The reiteration of the foregoing principle is designed to impress upon the defendants that they are not limited to making the necessary improvements within the limited context of the present admittedly problematical

facility and that they might consider utilizing additional facilities in order to implement certain provisions of this permanent injunction. To paraphrase *Gates v. Collier,* supra, ". . . if the [City] chooses to run a [jail] it must do so without depriving inmates of the rights guaranteed to them by the federal constitution." 501 F.2d at 1320.

With these considerations in mind, the Court will proceed to discuss only those areas which are in the greatest dispute. Those provisions which have not been seriously disputed or which have already been substantially implemented will not be dealt with.

## V. DAILY RECREATION

■ The defendants do not seriously challenge the implementation of recreation programs for the inmates of the Duval County Jail. What they do strenuously resist is the requirement that they establish a program of *daily outdoor* recreation. They contend that the present structural deficiencies at the Duval County Jail render it almost impossible to provide daily outdoor recreation for the inmates.

In *Rhem v. Malcolm,* 371 F.Supp. 594 (S.D.N.Y.1974), *aff'd and remanded* 507 F.2d 333 (2d Cir. 1974), which dealt with the Manhattan House of Detention (pejoratively referred to as the "Tombs"), the Court stated:

Dr. Menninger's observation that ". . . my profession considers it almost part of its ten commandments to say that everyone should have some exercise daily" finds its counterpart in the rule that "[c]onfinement for long periods of time without the opportunity for regular outdoor exercise does, as a matter of law, constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution." *Sinclair v. Henderson,* 331 F.Supp. 1123, 1131 (E.D.La.1971), quoted with approval in *Palma v. Treuchtlinger,* 72 C.1653 (E.D.N.Y., March 5, 1973).

The right of a prisoner to reasonable physical exercise is fundamental. *Where necessary, courts have required structural alterations to provide the required space,* see, e. g., *Hamilton v. Love, supra,* 328 F.Supp. at 1193 and decree of June 22, 1971, Par. 7D; *Wayne County Inmates v. Wayne County Board of Commissioners,* Civ. #173-217, Circuit Court, Wayne County, Michigan, July 28, 1972, at 25-6, *and have ordered that particular periods of exercise be made available, Hamilton v. Landrieu, supra,* 351 F. Supp. [549] at 550, *or that outdoor exercise areas be created, Taylor v. Sterrett, supra,* 344 F.Supp. at 422. See also, *Holland v. Donelon,* Civ.No. 71-1442 (E.D.La., June 6, 1973) at 12 and cases cited, *Brenneman v. Madigan, supra,* 343 F.Supp. at 135, 140; *Conklin v. Hancock, supra,* 334 F. Supp. at 1122 and *Jones v. Wittenberg, supra,* 330 F.Supp. at 717. (emphasis added)

371 F.Supp. at 626-627.

At the present time, each inmate in the Duval County Jail is allowed the opportunity of approximately two hours per week of outdoor recreation, one hour on Saturday morning and one hour on Sunday morning. This outdoor recreation is conducted on the parking lot adjacent to the jail. The parking lot is fenced in with barbed wire on top of the fence. Around the outside of the perimeter of the parking lot is a limited access street which can easily be blocked off without disrupting the normal flow of traffic. On normal weekday business hours, 8:00 A.M. to 5:00 P.M., the sheriff's office uses the parking lot for the parking of marked and unmarked police cars. The defendants contend that if this parking lot were used during the weekdays for the daily recreation of the inmates, the Sheriff's Office would have no place to park its cars. However, across the street from the parking lot of the sheriff's office is a municipal parking lot which could be utilized for the parking of sheriff's department vehicles.

In addition, across the street from the jail a new several million dollar police administration building is being constructed with underground parking which could also be utilized for the parking of these vehicles. Furthermore, the roof of the jail, with possible structural modifications, could possibly be used as an outdoor recreation area. In any event, the defendants have not affirmatively demonstated that it would be absolutely impossible to provide daily outdoor recreation. In fact, they have demonstrated that they can provide an opportunity for two hours of outdoor recreation each week despite their earlier protestations that even that minimal program would be impossible.

Thus, the situation in this case is not dissimilar to that in *Rhem v. Malcolm, supra:*

The 50 minute per week opportunity for exercise at MHD (even supplemented by other recreational programs) does not meet constitutional standards. The difficulty of providing space for exercise in an urban institution is unacceptable as justification for the deprivation imposed on MHD inmates. The jails in question in the cases cited were city facilities faced with the same difficulty.

The present administration of the Department is making admirable efforts to overcome the deficiencies in the existing program of physical exercise at MHD. Unfortunately, it appears unlikely that even the improved program will bring MHD up to constitutional standards. The plaintiffs are entitled to the relief necessary to achieve that objective.

371 F.Supp. at 627. This specific holding was affirmed on appeal, 507 F.2d 333 (2d Cir. 1974).

The defendants here have also done an admirable job in this regard. However, they have the distinct capabilities and capacity to do an even better one so as to provide a recreational program that will pass constitutional muster. This Court is not necessarily requesting a

large expenditure of funds for athletic equipment or a fully equipped gymnasium. What is most distressing is that at least 90% of inmates in the Duval County Jail never leave their cramped cellblocks, not even to eat meals. In addition, the continuing inadequacy of the ventilation and temperature control exacerbate what is already a cage-like atmosphere. Therefore, what this Court is most concerned about is providing an opportunity for daily exposure to fresh air and sunshine, and not a highly sophisticated athletic program.

Since the implementation of such a program requires time and additional personnel, the defendants will be given ample opportunity to plan accordingly. Therefore, the defendants will be required to implement a program of daily outdoor recreation within one year and a three day a week program within 180 days of the date of this permanent injunction.

■■■ The foregoing conclusions are bolstered by the fact that the city defendants provide extensive outdoor recreation for *convicted* prisoners at the Jacksonville Correctional Institution. This creates a patent equal protection violation since one class of inmates incarcerated by the city defendants is clearly being treated much more harshly than another class, without any justification therefor. In this regard, the Second Circuit has held that equal protection and due process prevent unjustifiable confinement of pretrial detainees under worse conditions than convicted prisoners. *Rhem v. Malcolm,* 507 F.2d 333, 336 (2d Cir. 1974). In fact, it is now well settled that ". . . the conditions for pretrial detention must not only be equal to, but superior to, those permitted for prisoners serving sentences for the crimes they have committed against society." *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676, 686 (D.Mass.1973), *affirmed* 494 F. 2d 1196 (1st Cir. 1974), *quoting Hamilton v. Love,* 328 F.Supp. 1182, 1191 (E. D.Ark.1971). *See also Jones v. Witten-*

*berg,* 323 F.Supp. 93, 100 (N.D.Ohio 1971), *aff'd sub nom, Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972).

## VI. CONTACT VISITATION

■■■ The defendants have strenuously opposed a requirement that they provide contact visitation to the inmates in the Duval County Jail on the grounds that to do so would pose a danger to institutional security and would present opportunities for the introduction of contraband into the jail. The basic problem they assert is that the present structure is simply not adaptable to contact visitation. However, this Court has already emphasized that financial difficulties do not provide a defense where constitutional rights are concerned. The question arises, then, whether pre-trial detainees have a constitutional right to contact visitation. This Court holds that contact visits are constitutionally required and, as support for this holding, adopts the language set forth in the district court's opinion in *Rhem v. Malcolm, supra,* because of that case's striking similarity to the instant case:

The conditions of visiting are simultaneously fundamental to institutional security and to inmate morale. When the two are in conflict, the need for security is paramount; but the need must be supported by the evidence, and the doctrine of least necessary restraint requires, as a matter of due process, that jail visiting conditions be curbed only to the extent needed to assure institutional security and administrative manageability. Moreover the equal protection clause mandates treatment of New York City detainees at least as favorable as that accorded New York State prisoners, unless a rational basis for the different treatment is provided. Yet convicted prisoners in New York are permitted contact visits, and substantially more visits than MHD detainees (including daytimes, weekends and holidays), for substantially longer periods.

The reasons proffered for the very much less favorable treatment of MHD detainees do not stand up. Although the City defendants have theorized that a detainee, anxious because of the uncertainty of his future, is more "predisposed" to attempt escape than a convicted prisoner, they have offered no evidence to support the theory, and we have indicated our doubt as to its validity. Although the fact that only one escape has occurred in the history of MHD may be argued to result from maximum security conditions, there is no evidence on the point, and in any event such an unusually good security record certainly does not support the view that MHD detainees have a particular predisposition to attempt escape. Indeed, defendants did not submit any evidence that attempts to escape were proportionately higher at MHD than other institutions, and it is reasonable to assume that such highly relevant proof would have been offered if it existed.

Nor is the argument that the urban location of MHD (as distinct from the rural, walled sites of State prisons) presents special escape problems persuasive in view of the fact that, for example, New York City federal detainees presently held within a short distance and soon to be held within two blocks of MHD) are permitted contact visits, as are detainees in other cities such as Philadelphia and even adolescent detainees held by New York City itself. Defendants furnished no evidence that escape problems were greater at these institutions because of their more liberal visiting programs and the evidence indicates no such consequences.

The same observations apply to the claim that the MHD visiting system is justified because of the threat of introduction of contraband. While that threat is undoubtedly higher than elsewhere in the present narcotic-ridden condition of New York City, it

has not been demonstrated to be higher than at the New York City federal detention center or the Department's own Adolescent Remand Facility, and the testimony is persuasive that it can be controlled at MHD as well as at other institutions by strip searches or other appropriate methods.

There is no doubt that the Department's administrators genuinely believe that allowing contact visits will pose a threat to institutional security. It is natural that those who are responsible for operations and who bear the brunt of the public's criticism if things go wrong will in good faith come to such a conclusion. Nevertheless, constitutional rights cannot be denied on the basis of "dire predictions" not supported by the evidence. *Goodwin v. Oswald*, 462 F.2d 1237, 1244–1245 (2d Cir. 1972); *Davis v. Lindsay*, 321 F.Supp. 1134 (S.D.N.Y. 1970). Although we recognize that the Department is closest to the situation, we find the evidence to establish that the increase in risk caused by contact visits will be marginal and controllable. In the circumstances, the dictates of due process and equal protection require that a system of contact visiting be introduced at MHD, including liberalization of visiting days and hours, at least for all detainees who, by classification are shown not to require maximum security custody.

For reasons stated at footnote 5 above, we do not rest our decision on the prohibition of cruel and unusual punishment (nor, as suggested by plaintiffs' brief, on the right to privacy under the Ninth Amendment). Nevertheless, we find that the present visiting system, which denies presumably innocent detainees (20% of whose cases may well be dismissed, many of whom are held for long periods and all of whom are in custody solely because of inability to furnish bail) the right to shake hands with a friend, to kiss a

wife, or to fondle a child, to be inhumane and cruel in fact. One court described similar visiting conditions as: ". . . an affront to the dignity of the prisoner as a man; they exceed the limits of standards of decency; and they are a shame to Philadelphia, as they would be a shame to any civilized community." *Jackson v. Hendrick*, 71–2437, Court of Common Pleas, Philadelphia County, Pa., April 7, 1972 at 225.

Such claims are proof against defendants' assertion that instituting a liberalized visiting system will require expenditures to increase the number of guards and to alter the visiting facilities. As Justice (then Judge) Blackmun has said: "[h]umane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations . . ." (*Jackson v. Bishop*, 404 F.2d 571, 580 (8th Cir. 1968)).

Our disposition of this issue follows many recent holdings to the same effect. *Bishop v. Lamb, supra,* Civil LV–1864 (D.Nev.), August 24, 1973; *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676 (D.Mass. 1973); *Collins v. Schoonfield,* 344 F. Supp. 257 (D.Md., July 27, 1972); *Jones v. Sharkey, supra,* C.A.4948 (D. R.I., June 7, 1972); *Jackson v. Hendrick, supra,* 71–2437 (Court of Common Pleas, Philadelphia County, Pa., April 4, 1972, at 131–7); *Jones v. Wittenberg, supra,* 330 F.Supp. 707, 717 (N.D.Ohio 1971), aff'd sub nom., *Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972); *Brenneman v. Madigan, supra,* 343 F.Supp. 128, 141 (N.D.Cal. 1972) and *Hamilton v. Love, supra,* 328 F.Supp. 1182.

371 F.Supp. at 625–626. This specific holding was upheld on appeal by the Second Circuit Court of Appeals, 507 F. 2d 333 (1974).

In the present case, the defendants have also failed to present direct evidence of the alleged threats to institutional security. In addition, the State of Florida provides eight hours of contact visitation per week, thereby, of course, presenting an equal protection violation. This is not to say, however, that this Court discounts the concerns advanced by the defendants with respect to institutional security within the context of the present structural limitations inherent in the Duval County Jail. Both of the expert witnesses who testified on this point, Charles Robert Sarver and Ellis C. McDougall, while affirmatively asserting the definite need for contact visitation, expressed concern about the defendants' capacity to provide contact visitation in the light of the structural limitations of the jail. Therefore, this Court is of the opinion that the appropriate remedy is to allow the defendants one year within which to establish a program of contract visitation and to require them to submit periodic reports on their progress in this regard.

## VII. GUARD CONTROL

This Court had the benefit of two experts on the subject of how many guards were needed to properly supervise the upper floors of the jail so as to prevent the extremely disproportionate number of incidents of violence and brutality among the inmates.

Ellis C. McDougall,[12] a consultant for the Law Enforcement Assistance Administration, testified, at pages 91–93 of

---

12. Ellis C. McDougall is a professor and associate director of the Graduate School of Criminal Justice of the University of South Carolina. He holds a B.A. in psychology and a Masters in sociology with a specialty in crime delinquency. He started his career in 1952 in the State of South Carolina as a juvenile probation officer, worked at a boys' reformatory for two years, was Superintendent of the First Offenders Youthful Prison Camp for four years, was Director of Prison Industries, and became Director of Corrections in the State of South Carolina from 1962 to 1968. He was Commissioner of Corrections in Connecticut from 1968 to 1971, where he supervised the operation of the prisons, the jails and the parole system. From 1971 to 1974, he was Commissioner of

the transcript of the final hearing held on June 6, 1975, that a minimum of four officers per floor were needed on each floor of the Duval County Jail strictly for the direct supervision of the inmates, to protect them from each other, until such time as a sophisticated classification system is developed and until the correctional officers in the jail become professionally trained, neither of which condition exists at the present time in the Duval County Jail. After these two conditions were fulfilled, he opined that three professionally trained correctional officers could adequately supervise the inmates housed in the upper floors of the Duval County Jail.

These four supervisory personnel on each floor would be comprised, according to his testimony, of one supervisor, two officers (one on each wing) and one "floater". He further testified that he thought it would take four to five months to implement a sophisticated classification program for inmates and a professional training program for correctional officers, after which time three officers per floor could handle the supervisory duties. This number, of course, did not include such additional personnel as would be needed to perform such additional duties as were primarily required during the 7:00 A.M.–3:00 P.M. and 3:00 P.M.–11:00 P.M. shifts, such as feeding prisoners and escorting them to court appearances, to interviews with probation officers, counsel, etc., and to the medical clinic for treatment. These additional duties seem to abate considerably during the 11:00 P.M.–7:00 A.M. shift, thus obviating the need for correctional personnel other than those that are required for strictly supervisory duties.

Charles Robert Sarver, a lawyer and former Director of the Division of Corrections for West Virginia and Arkansas, testified that he believed that six correctional officers per floor would be sufficient to handle the supervisory responsibilities assuming that the doors to the catwalks would be open. When the doors are open to the catwalk, the inmates are not given as much advance notice as to the arrival of a patrolling correctional officer. In other words, they would theoretically be less prone to engage in an assault or a rape since they could not be certain when their behavior would be interrupted by a patrolling correctional officer. Therefore, fewer correctional officers per floor are needed when the doors to the catwalks are open, as the evidence indicates is the case at this time.

The difference, as to the number of correctional officers, between the testimony of Mr. Sarver and Mr. McDougall is a conceptual one. Mr. Sarver advocated that a correctional officer be assigned to a stationary position in the catwalk outside each cellblock in order to provide direct eyeball contact with the inmates in that cellblock. Mr. McDougall, however, felt that that practice would be objectionable from the point of view of job satisfaction for the individual correctional officer who would be assigned that position and also from the standpoint of the general atmosphere created in the jail:

Q [By defendants' counsel, Mr. Coalson] In your experience, have you found that there is some advantage to having these correctional officers rove or patrol as opposed to being stationary in any one location?

A [By Mr. McDougall] I personally feel that in this type of setting with the number of inmates you have in an area, that one officer stationed in a particular place would defeat the purpose of trying to keep a good relationship between inmate and officer. I think his constant pressure there would build up a pressure among

Corrections for the State of Georgia, where he supervised the operations of the prisons and the probation and parole system. In

1974, he resigned to undertake his present position. He is also a consultant to the Law Enforcement Assistance Administration.

the inmate population that would be adverse to the kind of milieu that you try to have in a correctional facility where you try to keep as relaxed as possible but still under control.

Q What effect would it have on a correctional officer, in your opinion, to be stationed in one location eight hours a day?

A I don't know of a man that could do it and effectively continue to operate for a long period of time as a correctional officer. I think the job would be too boring. I think he probably eventually would be either absorbed by the inmates or lose interest in his job totally.

\* \* \* \* \* \*

Q Would, in your opinion, the results of a roving correctional officer be equal to, better than, or worse than having a stationary correctional officer?

A I believe it would be better.

Q And why?

A Because I think that you're going to keep the kind of attitude in the block that we try to have in a good correctional institution; that's relax with control, but that he will be able to keep down any problems by constantly being on the move and them not knowing where he's going to be at a particular time.

Transcript of Final Hearing on Permanent Injunction, June 6, 1975, pp. 27–29.

This Court finds the testimony of Mr. McDougall to be more persuasive. It appears that roving correctional officers would be more effective than stationary ones, thus obviating the need for two or three additional officers on each of the upper floors on each shift.

In summary, then, this Court concludes that three correctional officers per shift should be assigned to each of the upper floors of the Duval County Jail for strictly supervisory duties, assuming sophisticated classification and training programs are developed. However, until such time as the defendants demonstrate that these programs have been developed and implemented, this Court feels, on the basis of the expert testimony of Ellis McDougall, that there should be at least four correctional officers per floor for each shift whose duties are strictly supervisory in nature. Therefore, the defendants will be required to provide *five* officers per floor for the 7:00 A.M. to 3:00 P.M. and the 3:00 P.M. to 11:00 P.M. shifts. The additional officer will be needed on each of those shifts to perform the non-supervisory duties of feeding and escorting prisoners, etc. On the 11:00 P. M. to 7:00 A.M. shift, where it appears there are few, if any, non-supervisory duties to be performed, this permanent injunction will require only *four* correctional officers per floor. At such time that the defendants can demonstrate that they have developed and implemented sufficient classification and training programs, this Court will consider modifying this injunction along the lines already discussed.

## VIII. MEDICAL FACILITIES AND TREATMENT[13]

There have been some substantial changes in the Duval County Jail re-

---

13. As pointed out in *Battle v. Anderson*, 376 F.Supp. 402 (E.D.Okl.1974):

Inmates have a basic right to receive medical care while they are confined in prison (citing cases). . . . As a necessary corollary of that right, prison officials have an affirmative duty to make available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates. (citing cases) . . .

376 F.Supp. at 424. The denial of adequate medical care to *convicted* prisoners constitutes cruel and unusual punishment and a denial of due process and equal protection. *Newman v. State of Alabama*, 503 F.2d 1320 (5th Cir. 1974). Therefore, the denial of adequate medical care to pre-trial detainees who are legally presumed innocent would certainly be even more constitutionally offensive.

garding medical facilities and treatment since the issuance of the preliminary injunction. Some of these include the increase in nurses to 13 so that the crisis intervention desk is staffed 24 hours per day and the modification of what was formerly the females' cellblock into an infirmary with six beds. In addition, the defendants have contracted for the services of a fulltime physician and a physician's assistant for the entire Duval County correctional system, which includes the jail, the City Prison Farm (Jacksonville Correctional Institution) and Fairfield House (a halfway house).

The plaintiffs contend that there should be a fulltime physician or two halftime physicians at the Duval County Jail alone and not for the entire correctional system as a whole. However, this Court feels that a fulltime physician or two halftime physicians and a licensed physician's assistant can adequately handle the entire correctional system so long as there is at least a physician or licensed physician's assistant on call at the jail 24 hours a day. The basis for this conclusion is the proximity of the University Hospital to the jail for emergency treatment. A physician or licensed physician's assistant who would be on call at the jail 24 hours a day could handle the routine medical problems.

The plaintiffs also contend that this Court should require that the defendants provide a system of *direct* notification of a member of the medical staff of the inmates' requests for medical assistance. In other words, they would like for the nurses to *personally* receive the medical request slips directly from the inmates instead of having correctional officers relay the requests to the nurses who would remain in the clinic. The evidence seems to show that the correctional officers have been diligent in picking up the medical request slips from the inmates and that the inmates are receiving prompt medical attention. In addition, the allocation of at least one nurse to rove the housing areas of the jail to personally pick up these medical request slips would seem to unnecessarily divert that nurse from more pressing responsibilities. Therefore, this Court will not require direct communication of medical requests to medical staff. However, if direct notification becomes necessary, the permanent injunction can be modified accordingly.

## IX. OMBUDSMAN

This Court finds as a matter of fact that many of the problems inherent in the administration of the Duval County Jail arise from a lack of communication between the correctional staff and the inmates. It appears that a partial remedy to this situation would be the establishment of a *Permanent* Ombudsman to act as a middleman between the inmates and the correctional staff. His function would be to channel specific individual complaints of the inmates to the correctional staff where direct notification may be ineffective and, in addition, to communicate to the inmates the policies of the administrative officials where direct communication would be difficult or not well-received.

The establishment of this permanent ombudsman would not conflict and would, in fact, be consistent with the already existing Court's Ombudsman whose basic function is to insure daily compliance with this Court's orders, injunctions and decrees during the pendency of this case. The Permanent Ombudsman position, on the other hand, would be a permanent position designed to assuage differences that might arise between the inmates and the administration at the jail. During the pendency of this case, the Permanent Ombudsman would be responsible to the Court's Ombudsman to report any violations of this Court's orders, injunctions or decrees. Thereafter, the Permanent Ombudsman would be a permanent fixture in the efficient administration of the jail.

Therefore, this Court will require that the defendants establish an independent Permanent Ombudsman within six

months from the date of this permanent injunction. To avoid confusion in terminology, the position of Court's Ombudsman, ably filled by the United States Magistrate for the Jacksonville Division of the Middle District of Florida, the Honorable Joseph W. Hatchett, shall hereby be abolished.[14] However, the said Magistrate shall continue to monitor conditions in the jail until further order of this Court.

## X. BED CAPACITY

As already indicated, the Duval County Jail was originally designed to house 432 inmates but was actually housing on occasion in excess of 600 inmates. Pursuant to the preliminary injunction of January 31, 1975, the defendants reduced the population of the stated maximum of 432 inmates. However, due to some structural changes made in order to comply with other provisions of the preliminary injunction, some bedspace which was otherwise normally available was eliminated.

The evidence indicates that, at the present time, there are 32 bunks in the day rooms of certain of the cellblocks of the jail which thereby results in the same conditions of overcrowding as existed prior to the preliminary injunction *as to those particular cellblocks*. Therefore, the maximum allowable capacity will be required to be reduced accordingly.

Of these 32 bunks which are in the day rooms of certain cellblocks, only 22 of them are in cellblocks where the inmates are locked in 24 hours per day. The other ten are in cellblocks inhabited by trustees who perform duties in the Duval County Jail and who have free access to all parts of the jail from early in the morning until late at night. The deleterious effect of the placement of these ten bunks in the day rooms of the trustees' cellblocks is minimal. Therefore, on this basis and *only on this basis*, this Court will allow those ten additional bunks to remain in the trustees' cellblocks. However, in the event that this overcrowding in the trustees' cellblocks becomes sufficiently harmful to the health and wellbeing of the inmates incarcerated therein, this Court will not hesitate to modify its injunction to remove those bunks.

The 22 bunks in the day rooms of the other cellblocks must be removed, however, because of the fact that the inmates are forced to remain in those cellblocks 24 hours a day. The cellblocks are simply too cramped to allow those additional bunks to remain in the day rooms. Therefore, the Duval County Jail shall not house more than 410 inmates on a *normal daily basis*. However, in an emergency (such as a multiple arrest situation), the defendants will be allowed to house up to a maximum of 432 inmates for up to, but no more than, *72 hours*. The burden will be on the defendants to demonstrate the existence of this exceptional emergency situation to this Court prior to the time that they desire to exceed the normal capacity of 410. Therefore no bunks shall be placed in the day rooms of the cellblocks (except as to the trustees' cellblocks, as already indicated, and except during emergencies). The foregoing requirements are, of course, subject to any further limitations in the future imposed by the defendant Wainwright by virtue of his authority to regulate the maximum capacities of the jails in the State of Florida.

## XI. RIGHT TO REHABILITATION

This Court has ordered in its preliminary injunction and will order in this

14. As authority for the establishment of an Ombudsman, *see Hamilton v. Landrieu*, 351 F.Supp. 549 (E.D.La.1972), wherein the Court required that:

> Funds shall be made available to the Human Relations Commission to hire a 'Prison Ombudsman' who would work on behalf of the Commission to investigate complaints made by individual inmates and where complaints are well founded to seek relief from the appropriate officials.
> 351 F.Supp. at 552.

permanent injunction the implementation of certain changes in the conditions in the Duval County Jail which were and are in part designed to remove the physical and psychological barriers to any attempts made by inmates to improve or rehabilitate themselves so that they may become constructive members of society. This purpose is in accord with the recent trend of case law which is stated most succinctly in the well-reasoned opinion of Judge Frank Johnson in *James v. Wallace*, 382 F.Supp. 1177 (N.D.Ala.1974):

Where conditions within a prison are such that the inmates incarcerated therein will inevitably and necessarily become more sociopathic and less able to adapt to conventional society as the result of their incarceration than they were prior thereto, cruel and unusual punishment is inflicted. This Court, therefore, adheres to the principle set forth by the *Holt* court: "The absence of an affirmative program of training and rehabilitation may have constitutional significance where in the absence of such a program conditions and practices exist which actually militate against reform and rehabilitation." *Holt v. Sarver*, 309 F.Supp. at 379.

It should be pointed out that the degree of proof required to sustain plaintiffs' burden of proving that the conditions of Alabama prisons themselves tend to encourage asocial and antisocial behavior will be heavy one. But where it can be shown that prison conditions are so bad as to constitute cruel and unusual punishment, the relief to be afforded may properly include an order compelling the provision of certain basic rehabilitative services and facilities. See, *e. g., Jones v. Wittenberg*, 330 F.Supp. 707, 717 (N.D.Ohio 1971), affirmed sub nom., *Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972) [jail case], in which the district court, after finding that the totality of prison conditions amounted to a violation of the Eighth

and Fourteenth Amendments, ordered that the following steps, *inter alia*, be taken: (1) classification and diagnostic procedures for each prisoner at intake; (2) establishment of work or study release programs; (3) establishment of group and individual counselling programs; (4) establishment of basic and remedial education programs; (5) expansion of existing religious programs; (6) establishment of a recreation program; (7) establishment of a constructive work program; and (8) establishment of visitation programs.

382 F.Supp. at 1181.

◼ The principles expressed in *James v. Wallace, supra,* are all the more applicable when one considers the fact that that case involved *convicted* felons, whereas the instant case basically involves *pre-trial detainees* who are *legally presumed innocent*. If a convicted felon cannot be impeded from attempting to rehabilitate himself by the conditions of his confinement, then how much more true it is that persons presumed innocent cannot be so restricted since it is "firmly embedded in the law" that "a detainee may not be confined under conditions more rigorous than a convicted prisoner." *Rhem v. Malcolm, supra,* 371 F.Supp. at 623. Therefore, this Court shall hereby require the defendants to take affirmative measures to ensure that inmates incarcerated in the Duval County Jail are given the opportunity to rehabilitate themselves. These measures include group and individual counseling programs, basic and remedial education programs, expansion of existing religious programs, a recreation program and a vocational training program.

In this regard, this Court adheres to the principle enunciated in *Battle v. Anderson*, 376 F.Supp. 402 (E.D.Okl.1974):

Where inmates are confined to their cells for periods up to one year and subjected to continual and enforced idleness without affording them any opportunities for physical exercise, voluntary work, or educational pro-

grams, it must be concluded that such conditions of confinement constitute cruel and unusual punishment in violation of the Eighth Amendment. *Hamilton v. Love,* 328 F.Supp. 1182 (E.D.Ark.1971); *Sinclair v. Henderson,* 331 F.Supp. 1123 (E.D.La.1971); *cf. Osborn v. Manson,* 359 F.Supp. 1107 (D.Conn.1973).

376 F.Supp. at 424.[15]

## XII. PENDENT JURISDICTION

■ Under the doctrine of pendent jurisdiction, *United Mineworkers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), this Court clearly has the power to enforce state law where the federal and state claims are derived from a "common nucleus of operative fact", and are such that a plaintiff "would ordinarily be expected to try them all in one judicial proceeding." 383 U.S. at 725, 86 S.Ct. at 1138.

In the case of *Taylor v. Sterrett,* 344 F.Supp. 411 (N.D.Tex.1972), *affirmed as modified* 499 F.2d 367 (5th Cir. 1974), *cert. den.* 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665 (1975), the district court ordered sweeping changes in the conditions at the Dallas County, Texas, jail. Pursuant to its injunction, the Court ordered compliance with Texas state law as well as federal constitutional law. The Court of Appeals approved of the district court's exercise of its pendent jurisdiction in the following language:

In the exercise of its pendent jurisdiction, associated with the federal constitutional claims hereinafter mentioned, the Court ordered steps to insure compliance with the laws of Tex-

---

15. Although the defendants did not challenge the provisions of the preliminary injunction (which have been carried over into this permanent injunction) regarding the dissemination of published materials, the Court feels compelled to cite as authority therefor the following passage from the case of *Inmates of Milwaukee County Jail v. Petersen,* 353 F.Supp. 1157 (E.D.Wis.1973):

Under present rules, books, periodicals and newspapers and other published material enter the jail from two sources: They are supplied by the administration or they are sent directly from the publisher to the inmate. The latter method is rarely accomplished because of the short detention that applies to most inmates. Also, it normally takes a rather lengthy period to establish or change a subscription address. The jailer acknowledged at trial that the direct mail restriction was designed to limit incoming materials and thereby ease the burden of inspection for contraband. The defendants have failed to demonstrate a sufficient justification for such a curtailment of first amendment rights. *Pretrial detainees have an unqualified right to read any publication which is legally available to members of the public generally.* The defendants' subscription-only rule unduly interferes with that right. Detainees should not be denied the right to receive such publications, through the mail or from any source. Consistent with the prior portion of this opinion concerning inspection of mail, published materials may be examined to see if they are or contain contraband.

*Published materials may be designated as contraband only if they are found to be obscene under the strict standards enunciated by the United States Supreme Court or otherwise not entitled to first amendment protection. Palmigiano v. Travisono,* 317 F.Supp. 776, 790 (D.R.I.1970).

The defendants have suggested that a restrictive approach to admission of erotic materials is appropriate for a detention facility in order to avoid stimuli for homosexual attacks and other illicit sexual conduct. However, they offered no credible testimony or documentation in support of the assertion that material may be entitled to constitutional protection but still pose a threat to institutional security. I conclude that the defendants have not supported their retention of rules which would proscribe the detainees' first amendment rights. The jailer is generally not obliged to purchase or furnish reading materials which he considers detrimental to jail security, absent unusual circumstances. But see *Pitts v. Knowles,* 339 F.Supp. 1183 (W.D.Wis.1972). However, in determining whether publications received by the prisoner from other sources may be treated as contraband, the jailer must be guided by the Supreme Court definitions referred to above regarding obscenity. In case of doubt, the jailer should not circumscribe the detainee's first amendment rights. (emphasis added)

353 F.Supp. at 1169.

as with reference to local prison facilities. *The exercise of pendent jurisdiction in this area was correct,* Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Mobil Oil Corporation v. Kelley,* 5 Cir., 1974, 493 F.2d 784.

As to the enforcement of state laws applicable to this jail, . . . we have recently vacated a stay originally entered here pending appeal. It was specified that this action was without prejudice to the rights of the appellants to seek any justifiable modification in the District Court. *It would hardly be expected that a United States District Court, in the exercise of appropriate pendent jurisdiction, would decline enforcement of laws which the state, of its own volition, had enacted for the improvement of prison conditions within its jurisdiction.* The decree of the District Court on these topics is affirmed. The case is nevertheless remanded to enable the Court to enter such modifications, if any, as ought to be had in the light of the ongoing circumstances. (emphasis added)

499 F.2d at 368.

 Many of the requirements which this Court imposed upon the defendants in the preliminary injunction and which will be imposed in this permanent injunction are based on state statutes and regulations with which the defendants had consistently declined to comply until after the issuance of the preliminary injunction of January 31, 1975. Until such time as the Legislature of the State of Florida changes the applicable state statutes or the administrative agencies of the State of Florida changes the applicable administrative rules and regulations, this Court shall, in the exercise of its pendent jurisdiction, enforce the letter and spirit of those statutes, rules and regulations so long as they do not conflict with paramount federal law. *Anderson v. Nosser,* 438 F.2d 183, 188–

189 (5th Cir. 1971), *cert. den.* 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972).

## XIII. CONCLUSION

This Court wishes to take this opportunity to express its appreciation to counsel for the competent and professional manner in which this case has been litigated. In addition, the defendants Murray and McMillan are to be highly commended for the excellent way that they have sought to improve the conditions in the Duval County Jail in the relatively short period of time since their succession to the positions they currently occupy as Deputy Director of Prisons and Jails and Chief of Jails, respectively.

## ORDER

As an incident to the central issues in this case, by order dated February 14, 1975, this Court specified certain duties and responsibilities of the United States Marshal towards sentenced federal prisoners temporarily held in the Duval County Jail in Jacksonville, Florida.

On July 17, 1975, this Court entered its order and opinion and permanent injunction dealing with the remaining issues in this case. In this order of July 17, 1975, there was no further mention made of the duties and responsibilities of the United States Marshal. So that there may be no confusion, it is, therefore,

Ordered:

That the omission of any reference to the duties and responsibilities of the United States Marshal in the order and opinion and permanent injunction of July 17, 1975, is in no way intended to limit or modify the duties and responsibilities of the United States Marshal, and the order of this Court of February 14, 1975, is to remain in full force and effect until specifically modified or rescinded by the further order of this Court.